```
                UNITED STATES DISTRICT
                DISTRICT OF MASSACHUSETTS



AVENIR AGAJ (PRO SE),  )
       Plaintiff,      )
       vs              )  No. 1:24-CV-10884
BOSTON COLLEGE,        )
       Defendant.      )


         BEFORE THE HONORABLE JULIA E. KOBICK
             UNITED STATES DISTRICT JUDGE
                    MOTION HEARING


    John Joseph Moakley United States Courthouse
                  Courtroom No. 3
                 One Courthouse Way
             Boston, Massachusetts  02210

               THURSDAY, AUGUST 29, 2024
                      3:54 P.M.








             Catherine L. Zelinski, RPR, CRC
                 Official Court Reporter
     John Joseph Moakley United States Courthouse
             One Courthouse Way, Room 3-205
               Boston, Massachusetts  02210
          Email: CAL.Zelinski.Steno@gmail.com



         Mechanical Steno - Computer-Aided Transcript
```

**APPEARANCES:**

    Avenir Agaj
    14 Paul Street
    Burlington, MA 01803
    Phone: 857-544-0780
    Email: Aviaga10@hotmail.com
    PRO SE

    Alan D. Rose, Sr., Esq.
    Rose Law Partners, LLP
    One Beacon Street
    23rd Floor
    Boston, MA 02108
    Phone: 617-536-0040
    Fax: 617-536-4400
    Email: Adr@rose-law.net
    for Defendant.

```
                        P R O C E E D I N G S
 1
 2              THE CLERK:  All rise.
 3              (The Honorable Court Entered.)
 4              THE CLERK:  Thank you very much.  You can be seated.
 5    This is Civil Action 24-10884, Agaj versus Boston College.
 6              And will the plaintiff and counsel state your names
 7    for the record starting with Mr. Agaj.
 8              THE PLAINTIFF:  Hi.  My name is Avenir Agaj.
 9              THE COURT:  Good afternoon, Mr. Agaj.  Am I saying it
10    correctly?
11              THE PLAINTIFF:  Sorry?
12              THE COURT:  Agaj.  Am I saying it correctly?
13              THE PLAINTIFF:  Agaj.
14              THE COURT:  Agaj.  Good afternoon, Mr. Agaj.
15              THE PLAINTIFF:  Yeah, thank you.
16              ATTORNEY ROSE:  Good afternoon, your Honor.  Alan Rose
17    for the defendant Boston College.
18              THE COURT:  All right.  Good afternoon, Mr. Rose.
19              We're here on a hearing on the defendant Boston
20    College's motion to dismiss.  The way that I expect to proceed
21    is I'll have Mr. Rose argue first because it's Boston College's
22    motion.
23              Mr. Agaj, then I'll give you an opportunity to respond
24    and then a brief rebuttal for Boston College if it chooses.
25              So, Mr. Rose, go ahead.
```

1           ATTORNEY ROSE:  Thank you, your Honor.

2           Let me see if I can cut right to the chase here, your
3   Honor.  The Court has asked us to be prepared to discuss the
4   implications of the First Circuit's opinion in the *Bazinet* -- I
5   don't know if I'm pronouncing it correctly -- the *Bazinet* case.
6   Let me just start, though, by saying that Mr. Agaj, in order to
7   establish a prima facie case of religious discrimination, must
8   demonstrate that he had a bona fide religious practice or
9   belief that conflicted with the employment requirement.  Here,
10  of course, Boston College's requirement that all faculty, all
11  staff, all students, be vaccinated.  They imposed this
12  requirement in the summer of 2021 as of course COVID-19 was
13  sweeping the nation and indeed the world.  To qualify as a bona
14  fide religious practice, Mr. Agaj showed both that the belief
15  or practice is religious and that it is sincerely held.  For
16  purposes of this hearing we do not contest the sincerity issue.

17          However, Title VII does not mandate an employer or a
18  labor organization to accommodate what amounts to a purely
19  personal preference.  And so what the courts have done, I'm
20  sure the Court is aware, is to review complaints, review
21  requests for exemptions that have been made by employees who
22  have been terminated, and try to determine whether or not the
23  plaintiff has set forth a religious practice or belief that
24  conflicts with the employment requirement.

25          THE COURT:  So if I may, Mr. Rose.  Why don't we go to

1    the second -- Mr. Agaj's second exemption request, because I
2    think that's where he most clearly lays out his religious
3    beliefs and why in his view they conflicted with the vaccine
4    requirement.
5            ATTORNEY ROSE:  I'm happy to do that, your Honor.  I
6    would simply point out, however, that in both requests he did
7    say that he was seeking both a medical and a religious
8    exemption.  And I think -- I say that because the request for a
9    religious exemption must be viewed in the context of his
10   request for both religious and a medical exemption.  Indeed, in
11   his first request he did not mention the identity of his
12   religion at all.  And it just seems to us, your Honor, in
13   looking at -- in his second request, that what he was saying,
14   although he refers to religious beliefs, and he refers to the
15   Bogomil religion, what he says is, "It forbids me to take
16   anything that risks my health and spiritual well-being."  And I
17   would ask the Court to focus, and this is by way of distinction
18   from Judge Guzman's opinion.  And I think it's the *Taylor* case,
19   where Judge Guzman was -- there were five plaintiffs in that
20   case.  And I think that opinion is important, because it
21   demonstrates analytically the distinction between plaintiffs
22   who were able to establish that they had a sincerely held
23   religious belief or practice that conflicted with an employment
24   requirement, as contrasted with the plaintiff named Lawrence
25   who Judge Guzman determined had not demonstrated that he had a

1  religious practice or belief that conflicted with the
2  employment requirement.  And what, what Judge Guzman said
3  there, and I think it's relevant for purposes of this case, the
4  judge said that the complaint fails to explain the specific
5  Wiccan rituals and practices that prohibit followers from
6  receiving vaccines.  And that is exactly what we have here,
7  your Honor.  Now, Mr. Agaj does say that my religious beliefs
8  as Bogomils forbids me of taking anything that risks my health.
9  But focusing on that language, what do we have?  There's no
10 statement that the Bogomils' religion prevents him, forbids him
11 to be vaccinated.  Rather, what he says is that the Bogomils'
12 religion forbids me to take anything that risks my health.
13           THE COURT:  Well, let me just stop you there.  Because
14 he says, "I do declare my sincere religious held beliefs as a
15 practicing believer and descendent of the faith of the Bogomils
16 which forbids me to have a COVID-19 vaccine."  That seems to
17 directly assert that taking the vaccine is inconsistent with
18 his faith.  And then he does seem to identify -- or a specific
19 religious tenent, which is my body is my temple and it is my
20 duty and an obligation to keep it pure, free from filth.
21           Why in your view, and especially in light of _Bazinet_,
22 which I, you know, I think the First Circuit was clear that
23 where a plaintiff has alleged religious belief and maybe a
24 political belief or a medical belief or a personal belief that
25 personal or medical or scientific disagreement with COVID

```
 1   vaccine vaccination doesn't kind of affect whether there is a
 2   religious disagreement with COVID vaccine mandate.
 3             ATTORNEY ROSE:  I understand, I understand that point,
 4   your Honor.  I think the Bazinet opinion from the First Circuit
 5   makes it very clear.  That the fact that the, the terminated
 6   employee has both a religious practice and also has other
 7   beliefs, does not mean that his religious practice or belief
 8   that conflicts with the employment requirement might not
 9   qualify.
10             I understand the point, but looking at the entire
11   context here, it seems that what Mr. Agaj did was to make his
12   own determination that vaccines are -- his words, "filthy," and
13   also that the vaccine would risk his health.  Now, so it's not
14   that -- it's not that Bogomils directs that there can be no
15   vaccination.  It's that Bogomils, according to him, forbids him
16   from doing anything that would be unhealthy for his body.  And
17   he's made a determination.
18             THE COURT:  I would just point out, again, that it
19   says right here "The faith of the Bogomils prevents me from
20   having a COVID-19 vaccine."  I mean that -- he's represented
21   that as part of his exemption request.
22             ATTORNEY ROSE:  Well, your Honor, again, it seems to
23   me that looking at the request made in the context of all of
24   his statements, what he has done is to make his own
25   determination that vaccination is unhealthy for him and that
```

1    seems to be the basis for his request.
2            THE COURT:  Okay.
3            ATTORNEY ROSE:  I'd also point out that Boston
4    College, as it was entitled to do under EEOC's guidance, which
5    was issued, I believe, and reissued during the pandemic,
6    requested documentation, requested some form of documentation,
7    or a letter, that was set forth in both of the forms that he
8    filled out and he didn't provide any documentation at all.
9            THE COURT:  Can I ask you about that?  I mean, what
10   kind of documentation can an employer demand about religious
11   belief?  If someone carries a religious belief, they might not
12   have documentation of that belief, but they're certainly
13   entitled to hold it.
14           ATTORNEY ROSE:  I would agree, your Honor, although
15   here, again, we're talking about his request, which was joint.
16   It was both a religious -- he claimed both religious reason and
17   a medical reason.  And to the extent that he was saying that
18   Bogomils' religion prevents him from doing anything that harms
19   him, he needs to explain how the vaccine is going to, is going
20   to harm him, provide some kind of documentation, and he wasn't
21   able to do that.
22           THE COURT:  I'll just ask again, though, what are you
23   envisioning when you talk about documentation, like, from what
24   source?
25           ATTORNEY ROSE:  A letter from a doctor.  And, in fact,

1    your Honor, Boston College took a -- took a very strict view of
2    the circumstances under which they would grant exemption
3    requests.
4            THE COURT:  So I'm with you to the extent is
5    requesting a medical exemption, that a letter from a doctor
6    might make sense.  But I'm focussed on a religious exemption
7    request.  What kind of documentation in your view would
8    support, or is necessary to support a religious exemption
9    request?
10           ATTORNEY ROSE:  For example, what Boston College was
11   looking for was a letter from a pastor or a lay leader in their
12   religion.
13           THE COURT:  And how does -- how do you reconcile that
14   with the precedent that says you don't have to belong to a
15   house of worship or even an identifiable religion in order to
16   have religious beliefs?
17           ATTORNEY ROSE:  I grant that that is difficult, your
18   Honor.  But here he said he was a member -- after not
19   identifying his religion at all, then he identified Bogomils'
20   religion.  You can look it up, and there is a Bogomils'
21   religion.  And it seems to me that if this were a, you know, a
22   genuine -- he had a genuine bona fide religious belief, he
23   could have found someone to support his view that his statement
24   to Boston College, that the Bogomils' religion forbids
25   vaccination.  Boston college received nothing like that, your

1  Honor.
2          THE COURT:  Okay.
3          ATTORNEY ROSE:  I would just urge the Court -- I know
4  it's difficult, but I would urge the Court to try to think back
5  to the summer of 2021 when, again, people were, you know, dying
6  daily from this terrible disease.
7          THE COURT:  No doubt, yes.
8          ATTORNEY ROSE:  And to have someone who comes in not
9  just saying that he had a religious belief or practice that was
10 inconsistent with vaccination, but making, for the most part,
11 statements attacking, attacking the very concept of vaccination
12 and saying that Boston College was only requiring it because it
13 could get some money for it, and saying that it wasn't -- he
14 didn't feel safe having the vaccination.  He referred to the
15 fact that drug manufacturers were seeking to be indemnified.  I
16 infer that what he was basically saying was if drug
17 manufacturers want to be indemnified, it can only be because
18 they know that vaccination is not safe.
19         So, again --
20         THE COURT:  So I know there are a lot of other
21 allegations floating around.  And I guess I'm interested in --
22 specifically in the religious discrimination claims.  And I
23 take your point, but I want to focus in on just the religious
24 exemption request.
25         ATTORNEY ROSE:  Right.  But, again, your Honor, I

1  think -- I don't see anything in his request that meets the
2  standard that Judge Guzman was talking about in the Taylor
3  case, where referring to Plaintiff Lawrence, she said the
4  complaint fails to explain the specific Wiccan rituals and
5  practices that prohibit followers from receiving vaccines.
6           THE COURT: Okay. All right.
7           ATTORNEY ROSE: So that is clearly missing both from
8  the Affidavit of Fact and was certainly missing from his
9  request for exemptions.
10          THE COURT: Okay. Thank you, Mr. Rose.
11          Mr. Agaj, you're welcome to argue from the table or
12 you can use the podium, whichever you prefer.
13          THE PLAINTIFF: I'll use the podium.
14          THE COURT: Sure. And feel free to bring papers up as
15 well.
16          THE PLAINTIFF: I speak with my heart. I don't need
17 papers. I know what's written in there.
18          THE COURT: Sure.
19          THE PLAINTIFF: And I will tell the truth. And the
20 truth is this: My religious beliefs and my medical practices
21 are connected. They are not two different things. You go back
22 in our neck of the woods, which is the Balkans, everybody
23 practiced at the botany. They are connected to our beliefs.
24 We go on our beliefs that we don't need chemicals made in a lab
25 for our well-being. I will demonstrate the fact that I've

1   worked for Boston College for ten months.  I never got COVID.
2   Even three years after, I never got COVID.  How do you explain
3   that if the facts of the science are there.  I can go and take
4   any test you want and I can prove with facts I never had COVID.
5   And I had never a vaccine either.  So that proves that the
6   religious beliefs and medical practices are beneficial to me.
7   And they're not respecting my religion.  They're not respecting
8   my culture.  In fact, clearly stated, obviously at the
9   beginning it wasn't a condition from employment.  They made it
10  a condition of employment and I was informed for a condition of
11  employment only after they refused my accommodation.  On that
12  condition of employment, which should have been done by our --
13  sorry.
14          THE COURT:  That's okay.  Go ahead.
15          THE PLAINTIFF:  -- by our agreement.  I'm not an
16  employee at will.  I'm a contractor, not employee.  This is our
17  agreement with our union.  They go there, they sign it, they
18  agree to terms and conditions.  And there is nothing in this
19  book which represents that I must have a vaccine, especially an
20  experimental one allowed only for emergency use.
21          So, people have doubts.  That's normal.  But after
22  they learned about my religious beliefs and after Boston
23  College learned about my religious -- sorry, medical practices,
24  they refused to engage completely.  I have e-mails from
25  Ms. Chris Laflamme which she explicitly asked the diversity

1  office over there for my exemption and I got nothing in return.
2  And I have an e-mail over here which states okay, full-out
3  protocol, which is to fire me. This is all things
4  discrimination.
5        Furthermore, their concern for me bringing the disease
6  over there. Fair enough. I worked for ten months. I got
7  tested every time they requested it. I got 16 times tested,
8  all negative. Right? And I wasn't asking to work while being
9  sick.
10       I mean, you want me, you want me -- there is a
11 protocol which we follow. If I have fever, if I have nausea or
12 that, I'm going to take the day off and see tomorrow if I
13 have -- or I can go for a test privately. It's not a problem.
14 The problem is they didn't want to accommodate nothing. And
15 the problem is that after they stated that oh, we cannot
16 accommodate you for insufficient proofs and all that, well, I
17 gave you the proof. It's all written in the statement. But
18 that statement doesn't declare to you, to me, or to anybody it
19 will pose undue hardship on the business. How it will cause an
20 undue hardship on the business when they're making millions
21 from taxpayers' money. Through HUD, through FEMA, and all
22 those other organizations.
23       THE COURT: Mr. Agaj, can I ask you, after you
24 submitted your second exemption request --
25       THE PLAINTIFF: Yes.

```
 1                THE COURT:  -- you received a letter saying that it
 2    had been denied.
 3                THE PLAINTIFF:  Of course.  But that letter came a bit
 4    too late.
 5                THE COURT:  I was going to ask you at that point,
 6    then, you went through the administrative process in front of
 7    the Massachusetts Commission Against Discrimination and the
 8    EEOC as well; is that right?
 9                THE PLAINTIFF:  That's right.  That was after I got
10    fired.
11                THE COURT:  Right.
12                THE PLAINTIFF:  It wasn't before I got fired.
13                THE COURT:  Right.
14                THE PLAINTIFF:  Because I didn't know I wanted to get
15    fired --
16                THE COURT:  Right.
17                THE PLAINTIFF:  -- and once I got, like, the letter of
18    dismissal -- which by the way, they refused even to send it via
19    mail.  They said you come and pick it up.  So I'm allowed to
20    come and pick up the letter for dismissal for firing, you know,
21    for termination, but I'm not allowed to come into work.  These
22    are proofs which I can demonstrate all through John Bogdan
23    director of employment.  They're all in black and white.  And
24    they wanted to get rid of me by offering me packages and all
25    that stuff. My religion stands against corruption.  That's our
```

1    main goal, against corruption.

2            We don't build big churches.  We don't have called
3    IDs.  We don't pray in the church.  We can pray anywhere we
4    want.  God is everywhere.  And these are our beliefs.  Our
5    beliefs are for honest work.  My religion is not against my
6    job.  My job is against my religion, this is the difference.
7    They put barrier to my employment through making this policy,
8    and they never engaged it once they learned and they learned
9    exactly why religious beliefs and medical, medical practices --
10   they never engaged afterwards.  Not even a single word saying
11   look, you know, we can have a chat.  We can talk about how can
12   we, like, you know, work it out.  Nothing.  Their way of
13   talking about was, Okay, do you want to receive the package?
14   That was, you know, for -- to get the money and get rid of me
15   sort of a thing.

16           THE COURT:  I understand your argument.  I did want
17   to --

18           THE PLAINTIFF:  Three years of anger.  I do apologize
19   for my tone.

20           THE COURT:  No, and I understand.  And this is what
21   the hearing is for, is for you to present your view of the
22   case.

23           I did also want to note, I know you filed a motion
24   seeking an immediate jury trial.  And I wanted to just explain
25   to you kind of procedurally where we are in the case.

1             So, if I grant Boston College's motion to dismiss,
2  that would be the end of the case.  If I don't grant it or I
3  grant it in part and deny it in part and allow some of the
4  claims to proceed, there's a process of civil discovery where
5  both sides get to exchange information to try to -- for you to
6  try to prove your claims and for Boston College to try to make
7  its defenses.  And those are set forth in the federal rules of
8  civil procedure.
9             If we get to that point, I urge you to look at that.
10 And we also, if again, if I deny in part the motion and some of
11 your claims survive, you can consider seeking counsel.  Maybe
12 pro bono representation if that's of interest.  But there is a
13 civil discovery process.  And we'll set a schedule for how that
14 process unfolds.  So, a jury trial doesn't happen right away.
15 There has to be that process before a trial could take place if
16 there were a factual issue that a jury needed to resolve.  But
17 I wanted to just kind of talk to you about how that process
18 unfolds in relation to that motion that you had filed, and if
19 you have any questions about that, I'm happy to answer them.
20            THE PLAINTIFF:  Yeah, I would like also to add that my
21 request for damages is reasonable.  It's not something out of
22 the blue.  I just want my job back with back pay, which
23 everybody is asking for that who got fired.  Whether it's
24 military, whether it's civilian, whether it's hospital,
25 whatever.  I'm not for profit.  I lost money.  Not only money,

```
 1   I lost more than money, you know?
 2           THE COURT:  Yes.
 3           THE PLAINTIFF:  We went all through that.  Like I
 4   said, my intentions were never to bring the disease to Boston
 5   College.  Like I said, I would have acted responsibly.  If I,
 6   you know, had the disease, I would have stayed at home.
 7   Obviously sick time, that's worth, you know, for that sort of a
 8   thing.  And for Boston -- like, I said I worked for Boston
 9   College, I never caused any undue hardship or anything.
10   Because if undue hardship would have been there, would have
11   been from Day One.  Not -- COVID didn't start in the 13th of
12   August which I was dismissed and not allowed to be on campus.
13   Furthermore, that Boston College didn't allow me as a Boston
14   employee to be on campus, but they allowed unvaccinated
15   contractors, suppliers, and vendors.  These are all written and
16   everything is documented in the statements.  And everything is
17   proof by Mr. McGode, I think which is director of the ethics at
18   Boston College.
19           So like I said, they completely discriminated against
20   us as employee.  And like I said, don't think there is no
21   reason for it.  The reason is religious because we as a
22   religion as Bogomils were still regarded by the Catholic faith,
23   and we suffered from the Jesuits before through crusaders and
24   inquisitions and all that stuff, and are partially responsible
25   for our diminution as a religion.
```

1          THE COURT:  Okay.

2          THE PLAINTIFF:  Like I said, this is the reason why I
3 disclose it, because I didn't want to bring a conflict of
4 interest.  But afterwards to save my job, I had to tell the
5 truth and the truth is that.  And if they, they disagree with
6 my religion, well, that's their problem.  It's not my problem.

7          THE COURT:  Okay.  Thank you, Mr. Agaj.

8          THE PLAINTIFF:  Appreciate it.

9          THE COURT:  I will give Mr. Rose a chance for a brief
10 rebuttal if there are any points you'd like to make, and then I
11 expect I'll take the motion under advisement after that.

12         ATTORNEY ROSE:  Just very briefly, your Honor, I did
13 not hear Mr. Agaj say anything to the effect that the Bogomils'
14 religion is opposed to vaccinations.  He had an opportunity to
15 say that, and I didn't hear him say that.

16         Also, there are other claims that are set forth in his
17 Affidavit of Fact.  We have explained in our papers why none of
18 those claims, privacy claim and others, state a claim.  We'll
19 rest on our papers in that respect.  And with regard to undue
20 hardship, your Honor, that, of course, is a defense that exists
21 in the statute and we will be advancing that defense in due
22 course in the event that the motion to dismiss is denied.

23         THE COURT:  Okay.  Thank you, Mr. Rose.

24         Thank you, Mr. Agaj.  And I appreciate both sides'
25 argument.  I know it's hard to come into federal court and make

```
 1   an argument, and I appreciate hearing from you today, Mr. Agaj,
 2   and as well as from Boston College.  I am going to take the
 3   motion under advisement.  That means I'll resolve it in a
 4   written decision that will go out to both parties and then
 5   we'll see beyond that.
 6            But thank you, and we'll stand in recess.
 7            THE CLERK:  All rise.
 8            (The Honorable Court Exited.)
 9            (Whereupon, at 4:20 p.m., Court Stood in Recess.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# C E R T I F I C A T E

**UNITED STATES DISTRICT COURT )**

**DISTRICT OF MASSACHUSETTS     )**

I, Catherine L. Zelinski, certify that the foregoing is a true and accurate transcription of my stenographic notes from the record of proceedings taken Thursday, August 29, 2024, in the above-entitled matter to the best of my skill and ability.

/s/ Catherine L. Zelinski

Catherine L. Zelinski, RPR, CRC     _10/4/2024_
Official Court Reporter                              Date