**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AVENIR AGAJ,                 ) <br>             ) <br>       Plaintiff,           ) <br>     v.                  ) <br>             ) <br> BOSTON COLLEGE,        ) <br>             ) <br>       Defendant.       ) | Civil Action No. 1:24-CV-10884-JEK |

**DEFENDANT TRUSTEES OF BOSTON COLLEGE'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Trustees of Boston College ("Boston College" or "BC") respectfully submits this Memorandum in Support of its Motion for Summary Judgment. Boston College is entitled to summary judgment as to Plaintiff Avenir Agaj's ("Plaintiff" or "Agaj") claims for religious discrimination under Title VII and G.L. c. 151B. First, Plaintiff's claims fail because he refused to provide the information Boston College reasonably requested to evaluate his exemption request. Second, his objections to Boston College's vaccine mandate are not religious in nature, but rather are based upon his own personal beliefs, medical concerns, and skepticism towards the COVID-19 vaccine. Third, even if Plaintiff had completed his exemption request, and even if his beliefs were religious in nature, approval of Plaintiff's request to work on campus unvaccinated would have posed an undue hardship on Boston College. If Boston College permitted Plaintiff to work unvaccinated, he would have posed a threat to the health and safety of Boston College students, faculty and staff members and risked damaging Boston College's reputation of providing a safe environment for students, faculty and staff to learn, live or work during a global pandemic. Accommodating Agaj, and all other employees who sought a religious exemption, would have also resulted in a substantial increased cost and administrative burden to Boston College.

## FACTS

In early 2020, a novel and highly contagious coronavirus now known as COVID-19 spread across the globe. Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak, 85 Fed. Reg. 15337 (Mar. 18, 2020).[1] By March 2020, the pandemic had effectively shut down the country as the President and Governors of all 50 states declared States of Emergency. Id. By the end of 2020, COVID-19 had killed over 385,676 people in the United States. Ctr. For Disease Control and Prevention, Provisional COVID-19 Mortality Surveillance, https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm (last visited July 21, 2026). As of July 21, 2026, 1,245,965 Americans have been killed by COVID-19. Id.

In April 2021, the Delta variant rapidly caused a new wave of COVID-19 infections, with cases rising sharply from April/May 2021 and displacing the previous Alpha variant to become the primary strain by July 2021. SMF ¶ 19. The Delta variant was roughly 60% more transmissible than the Alpha variant and twice as likely to cause hospitalization, especially in unvaccinated individuals. Id. It spread faster, caused severe disease more quickly, and carried mutations that partially evaded immunity, resulting in higher breakthrough infections.[2] Id. While Delta's high viral load made these infections more common, vaccines remained highly effective at preventing severe illness, hospitalization, and death. Id.

**COVID-19 Prevention Measures**

Prior to the availability of SARS-CoV-2 vaccines, universities, including BC, had to implement a wide range of expensive and sometimes disruptive policies (e.g. remote learning, masking, social distancing, limited access to in-person services, repeated testing, isolation and

---

[1] The Court may take judicial notice of these facts. Does 1-6 v. Mills, 16 F.4th 20, 26 n.3 (1st Cir. 2021)
[2] A Delta variant breakthrough infection occurred when a fully vaccinated person (≥14 days post-vaccination) tests positive for SARS-CoV-2. SMF ¶ 19.

quarantine) in order to contain viral spread on University campuses. SMF ¶ 16. Prior to widespread availability of COVID vaccines, mathematical models predicted that high levels of vaccination would be required to contain the spread of SARS-CoV-2 and to prevent disease and death on university campuses. Id.

**Vaccination Requirement at Boston College**

Boston College determined that the benefits of in-person education during the pandemic, including the mental health benefits to students, demanded that it make significant efforts to provide in-person learning for the 2021-2022 academic year. Id. ¶ 15. BC also determined that mandating vaccination for all students, faculty, and staff was critical to achieving that goal, as it was the best way to protect against severe illness, hospitalization, and death. Id. ¶ 17. BC's decision was based on scientific studies, opinions and analysis, as well as the recommendation of the federal Centers for Disease Control and Prevention ("CDC"), the U.S. Department of Health and Human Services, and the Massachusetts Department of Public Health. Id.[3] Vaccination was particularly important on college campuses like BC, given the close proximity in which students, faculty and staff interact on a daily basis. In 2021, BC had in excess of 15,000 students and 3,500 faculty and staff. Id. ¶ 18. BC established a limited process through which employees could seek exemptions for medical or religious reasons. Id. ¶¶ 20-22.

On April 23, 2021, BC first announced its mandatory vaccination policy, stating that, to "promot[e] the health and safety of our campus community and surrounding neighborhood . . . the University will require all students, faculty, and staff to be fully vaccinated (with FDA-approved vaccines) against COVID-19 before participating in any on campus activity related to the 2021-2022 academic year." Id. ¶ 20. That announcement further stated that exceptions would

---

[3] The Affidavit of Welkin Johnson, Ph.D., a virologist and biologist, explains the importance of vaccination and the risks posed by unvaccinated individuals on BC's campus. Johnson Aff. ¶¶ 6-14.

be granted for religious and medical reasons. See Lowe Aff. Ex. 1. Vice President of Human Resources David Trainor followed up with further emails on May 10 and 13, 2021 explaining how to apply. SMF ¶¶ 21, 22. On May 28, 2021, Mr. Trainor informed everyone of two deadlines: August 13, 2021, to be fully vaccinated if returning to campus before classes resumed, and August 1, 2021, to submit a request for an exemption. Id. ¶ 25. As a result of BC's vaccination policy, BC achieved an ~99.3% vaccination rate among students, faculty, and staff. The high vaccination rate at BC lessened the spread of infections among those on campus, and likely lessened hospitalizations and serious illness among those who became infected. Id. ¶ 41.

**Exemption Process**

Patricia Lowe, the Associate Vice President for Human Resources[4] and the University Title IX and ADA Coordinator, and Edilma-Hosein Reyes, the Assistant Director of the OID at the time, were tasked with administering the process of reviewing and making decisions on exemption requests. Id. ¶ 23. Employees seeking a religious exemption were required to submit information supporting their request, including an explanation of the basis for their sincerely held religious belief and supporting documentation, such as a letter from the applicant's pastor, spiritual advisor, or other faith leader. Id. ¶ 24. Fr. Anthony Penna, who was the Associate Vice President and Director of Campus Ministry, reviewed the requests when and if completed. Penna Aff. ¶ 7. Applicants for medical exemptions were required to submit a letter from their physician, stating that vaccination was contraindicated by the applicant's medical condition. SMF ¶ 24.

**Plaintiff's Employment at Boston College and Job Responsibilities**

Agaj was hired as a landscaper in BC's Facilities Management department in the midst of the pandemic, in mid October 2020. Id. ¶ 2. As landscapers were deemed essential employees

---

[4] The Office of the Vice President for Human Resources ("OVPHR") was previously called the Office for Institutional Diversity ("OID").

during the pandemic, they worked on the Boston College campus throughout the pandemic. Id. ¶ 3. While Agaj's job responsibilities included general outdoor landscape work, cutting grass, hedging, and snow removal, it also included a multitude of indoor tasks. For example, landscapers were responsible for moving and disposing of furniture from various indoor sites on campus, including classrooms, which was performed in groups of at least two people. Id. ¶¶ 4-5. Their duties also included event management for meetings, conferences and other campus events, working in teams of two to four people, carrying, placing, and removing tables, chairs, and other equipment for indoor and outdoor events, and breaking down the equipment post event, picking up trash, and traveling together. Id. ¶ 5.

Each morning, all union employees were required to "swipe in" and receive daily work assignments from an operations supervisor. The Landscape Services staff comprised approximately twenty-eight people, at least half of whom, including Agaj, swiped in at 300 Hammond Pond Parkway. In addition, approximately 90 Custodial Services employees reported to and from the same location, and their supervisors as well as management staff shared that building. Id. ¶ 7. Landscape operations supervisors conducted team meetings, when necessary, with all of the landscape services staff; these meetings were typically held indoors. Id. ¶ 8. Throughout the day, the landscape workers, including Agaj, typically took coffee and lunch breaks at various indoor break rooms across campus. During such breaks, given that people were eating and/or drinking, people were typically unmasked. Id. ¶ 9. At times during the day, Agaj travelled by truck between work sites across the campus and was often in the truck with one or two other landscape workers. Id. ¶ 10. During the colder months, landscape workers, including Agaj, often worked indoors for "shop" cleanup, which involved reviewing inventory and equipment and organizing supplies. This work was also done in groups. Id. ¶ 12. The majority of

work performed by Agaj was performed with a partner, in part for safety reasons, or with a group due to the number of people necessary to complete a task. Id. ¶ 11. While precautions were taken to reduce transmission of COVID-19, employees in Facilities Management were consistently testing positive for COVID prior to the vaccination mandate. Id. ¶ 13. Once vaccinations became available and BC imposed its vaccination requirement, the positive test results dramatically declined by the end of August 2021. Id. ¶ 14.

**Health, Safety and Other Risks Posed by Agaj to Others if Unvaccinated**

As part of his responsibilities, Agaj came into contact, in enclosed spaces, with numerous members of the BC community, including students who worked in Facilities Department, faculty and staff. Id. ¶ 42. He regularly performed tasks with other team members, the majority of which required physical activity, which increases the risk of potential transmission. Id. ¶ 42. Due to the highly transmissible nature of COVID, Agaj, if he became infected, could have readily passed the virus on to other individuals in the BC community, who could have then infected others. Id. ¶ 43. The risk of having just one person who can transmit the virus poses a significant risk to other individuals, particularly given the breakthrough infections caused by the Delta variant. Id. Allowing Agaj to work unvaccinated in the Fall of 2021 would have caused an undue hardship to Boston College because it would have increased the likelihood of COVID-19 infection among staff, faculty and students at Boston College. Id. ¶ 47.

To accommodate Agaj's request to work unvaccinated, BC would necessarily have had to engage in alternative measures to ensure the safety of the BC community. These measures would have created a substantial increased cost to BC. For example, alternative measures such as repeated testing; monitoring Agaj's compliance with masking or social distancing; keeping Agaj fully separated from immunocompromised individuals; and strategically coordinating and/or

limiting the number of individuals with whom Agaj worked would require BC to expend significant time and resources and disrupt the work of his department. Id. ¶ 44. Because the majority of Agaj's work required him to work with a partner for safety purposes, BC could not accommodate Agaj by allowing him to work on his own. Id. ¶ 45. Further, removing Agaj from group work would require other landscapers to assume many of his essential duties and increase the burden on them to complete assignments requiring physical labor. Id. Moreover, none of those measures would be likely as successful as vaccination. Id. ¶ 44.

If BC had accommodated Agaj and the approximately 40 other religious exemption requests it received, BC would have had to test these individuals for COVID-19 three to four times per week, as well as test any person in proximity to an unvaccinated individual. Id. ¶ 48. During the pandemic, BC hired temporary nurses to take the swabs, and sent all employee swabs to the Broad Institute for processing, all at BC's expense. BC also tracked down individuals who missed tests. Id. In addition to increased cost and administrative burden, BC would have needed to arrange for these unvaccinated employees to be separated from others, which was an increased challenge for employees whose jobs required movement around campus. BC would have needed to inform unvaccinated employees' supervisors, while maintaining the privacy of the unvaccinated employees' vaccination status. Id. ¶ 49.

Granting Agaj's incomplete request for an exemption also risked drastically undermining the faith BC community members had entrusted in the school. Id. ¶ 50. If current and prospective students and their parents no longer trusted BC to provide the necessary environment for learning – due to an avoidable breakout – BC would have faced enormous reputational cost. Id.

**Agaj's Exemption Requests**

On June 23, 2021, Agaj filled out and emailed his first exemption request, stating, in

pertinent part, that 1) vaccination would have an adverse effect on his immune system; 2) vaccination would go against his "religius believes faith healing," and 3) "As long as idemnity for vaccines is in place i dont feel safe having one" [sic]. SMF ¶ 26 & Lowe Aff. Ex. 2. In the box requesting medical or religious documentation and any additional information, Agaj simply wrote, "Please grant me exemption for the reasons stated above." Id. Agaj's request for exemption did not include any documentation or explanation. Id. The request for a medical exemption did not indicate how vaccination was contraindicated by any medical condition of Agaj, and did not include any letter from a treating physician, which BC needed in order to consider Agaj's request for a medical exemption. SMF ¶¶ 26-27. Agaj did not identify his religion.  See id.

On the same day, June 23, 2021, Ms. Edilma-Hosein Reyes requested that Agaj provide documentation in support of his request for exemption. SMF ¶ 27 & Lowe Aff. Ex. 3. Agaj responded on June 23, 2021 by sending **three** separate emails to Ms. Reyes, which refused to provide any documentation and accused her of violating his rights under "the disability act 151B, religious freedom RFRA" and "Privacy law 18 chapter 214 title 1 Part 3." SMF ¶¶ 28-30 & Lowe Aff. Exs. 3-5.

When Ms. Lowe reviewed Agaj's request for exemption on June 24, 2021, and saw that he had declined to provide documentation, she emailed Agaj that BC did not have sufficient information to make a decision. SMF ¶ 31 and Lowe Aff. Ex. 5. She advised him that Title VII permitted BC to request supporting documentation and requested that he provide documentation because BC could not, "effectively evaluate [his] exemption request without some explanation or documentation of the nature of [his] medical or religious belief and how it applies to the vaccine requirements." Id. On June 30, 2021, Ms. Reyes sent a "gentle reminder" to Agaj that if

documentation were not received in five days, BC would deny his request. SMF ¶ 32. Agaj

replied to this request for supporting documentation by stating that Ms. Reyes' email was not a

gentle reminder, but an "ULTIMATUM [sic]. Rest assure I will take action ageist any retaliation

and denial of my request for vaccination exemption [sic]." SMF ¶ 33 & Lowe Aff. Ex. 6. On

July 8, 2021, OID emailed Agaj, telling him that his request was denied. SMF ¶ 34 & Lowe Aff.

Ex. 7.

Two weeks later, on July 26, 2021, Agaj submitted a new request for exemption, stating,

in substance, that the vaccine was a "health risk for healthy people," that his Bogomils religion

"forbits [sic] me to take any thing that risks my health and spiritual wellbeing", that "[his] body

is [his] temple it is [his] duty an obligation to keep it pure, free from filth." SMF ¶ 35. Agaj

contends that COVID-19 vaccine is ineffective and harmful because it "does not protect humans

from getting COVID-19" and "[h]as adverse side effects as vaccine," among other things. Id. ¶

40. Agaj's second request also stated that he relied on "Folk Medicine of Ethnobotany" for his

medical care. Id. ¶ 35. His new request likewise failed to include any documentation to support

his request for a medical and religious exemption. See Id.

Accordingly, on August 6, 2021, with the deadline for submitting proof of vaccination

only a week away, Vice President Trainor sent an email to employees whose requests for

exemption had been denied. He urged them to be vaccinated. SMF ¶ 37. Agaj did not get

vaccinated. Id. ¶ 38. On August 19, 2021, Agaj was notified that his employment at BC was

terminated. Id. ¶ 39.

## PROCEDURAL HISTORY

On September 29, 2021, Agaj filed a complaint with the MCAD alleging that Boston

College discriminated against him on the basis of his creed in violation of M.G.L. c. 151B, § 4

and Title VII of the Civil Rights Act of 1964. ECF 39, p. 4. On November 28, 2023, the MCAD issued a Lack of Probable Cause disposition and dismissed Agaj's Complaint. Id. On January 30, 2024, the MCAD affirmed. Id. On April 5, 2024, Plaintiff filed his Affidavit of Fact in this Court. On November 12, 2024, this Court dismissed all of Plaintiff's claims, with the exception of his claim for religious discrimination under Title VII and G.L. c. 151B.  ECF 39, pp. 1, 11.

## ARGUMENT

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Geronimo v. Melrose-Wakefield Healthcare Corp., No. 1:23-CV-11138-JEK, 2025 WL 2050286, at *3 (D. Mass. July 22, 2025) (quoting Fed. R. Civ. P. 56(a)). To prevail, "the moving party … must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, 'demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernandez v. Fortuno-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000) (citations omitted)). Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" Geronimo, 2025 WL 2050286, at *3 (quoting Dixon-Tribou v. McDonough, 86 F.4th 453, 458 (1st Cir. 2023)).

I.    **BOSTON COLLEGE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS OF RELIGIOUS DISCRIMINATION UNDER 42 U.S.C. § 2000E-2(A) AND M.G.L. C. 151B § 4(1A).**

To make out a claim of religious discrimination under Title VII and chapter 151B,[5] plaintiff must make a prima facie case "'that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action.'" Bazinet v. Beth Israel Lahey Health, Inc., 113 F.4th 9, 15 (1st Cir. 2024) (quoting Lowe v. Mills, 68 F.4th 706, 719 (1st Cir. 2023)). If Plaintiff makes that showing, "the burden shifts to the [employer] to show that it 'offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship.'" Id. (quoting Mills, 68 F.4th at 719).[6]

A.    **Plaintiff's Claims Fail Because He Refused to Submit a Complete Exemption Request**

Title VII does not require an employer to grant a religious accommodation based solely on an employee's assertion that one is warranted. The EEOC expressly recognizes that an employer may require an employee requesting a religious accommodation to provide sufficient information to permit the employer to evaluate the request, including limited information regarding the sincerity and religious nature of the asserted belief. See EEOC, *Section 12: Religious Discrimination* § 12-IV(A)(2) ("Where the accommodation request itself does not provide enough information to enable the employer to make a determination, it is entitled to make a limited inquiry into the facts and circumstances of the employee's claim that the belief or

---

[5] "Religious discrimination claims under Title VII and Chapter 151B are generally analyzed under the same framework. Geronimo, 2025 WL 2050286, at *3 n.3 (citing Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 131-32 (1st Cir. 2004); Brown v. F.L. Roberts & Co., Inc., 452 Mass. 674, 676-77 (2008)).

[6] The First Circuit's Bazinet opinion does not assist Agaj. First, it arose in the context of the District Court's *sua sponte* decision dismissing the Complaint. 113 F.4th at 15. Second, Bazinet offered information and explanation in support of her claim. Id. Third, the Court made clear that the undue hardship defense depends on the existence of facts that cannot be determined without going outside of the four corners of the Complaint. Id. at 18-19.

practice at issue is religious and sincerely held, and that the belief or practice gives rise to the need for the accommodation.").[7] Likewise, the EEOC has explained that "[a]n employee who fails to cooperate with an employer's reasonable requests for verification of the sincerity or religious nature [of the asserted belief] risks losing any subsequent claim that the employer improperly denied an accommodation."[8]

"[T]he employee has a duty to cooperate with the employer's good faith efforts to accommodate." See LaFreniere v. Spectrum Health Sys., Inc., No. 4:23-CV-40066-MRG, 2025 WL 2793761, at *5 (D. Mass. Sept. 30, 2025) (quoting Cloutier v. Costco Wholesale, 311 F. Supp. 2d 190, 198 (D. Mass. 2004)). In Marsman v. Massachusetts Bay Transportation Auth., No. CV 24-13218-RGS, 2026 WL 1919552, at *4 (D. Mass. June 17, 2026), the plaintiff failed to complete or submit the MBTA's religious exemption form. The MBTA warned him regarding his non-compliance with its policy and ultimately discharged him. Id. In granting summary judgment for MBTA on plaintiff's Title VII and c. 151B claims, the Court found that "[t]he MBTA has demonstrated that it offered a reasonable accommodation in the form of an accessible process by which employees could apply for an exemption to the Policy" and Marsman "has not adequately alleged that he followed that process." Marsman, 2026 WL 1919552, at *4-5.

Here, Boston College legitimately required applicants to explain the basis for their request and provide supporting documentation. SMF ¶¶ 24, 31. Agaj cannot demonstrate that he followed that process. Id. ¶¶ 26-27, 31, 36, 38. His initial request contained no explanation of the

---

[7] See Groff, 600 U.S. at 471 ("a good deal of the EEOC's guidance in this area is sensible and will, in all likelihood, be unaffected by our clarifying decision today"); Weiss v. Permanente Med. Grp., Inc., 738 F. Supp. 3d 1217, 1224 (N.D. Cal. 2024) ("Pursuant to EEOC guidance, TPMG was well within its rights as the employer seeking to implement a uniform policy across its employees to inquire narrowly into Weiss's beliefs and any conflicts with the Policy.")

[8] See EEOC, *What you Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (last visited July 17, 2026).

medical or religious basis for his request and no supporting documentation. SMF ¶¶ 26-27; ECF 39, p. 6. When Boston College explained why additional information was necessary and invited Agaj to supplement his request, SMF ¶ 27, Agaj refused, insisting that he was not required to provide any further information regarding his religious beliefs. Id. ¶¶ 28-30. Although he later submitted a second request, he again failed to provide any supporting documentation or explanation to support the lack of any such documentation, despite his knowledge of the requirement and Boston College's repeated prior requests. Id. ¶¶ 27, 31-32, 34-36. At the time his employment ended, Boston College had still not received the information it had requested to evaluate his exemption request. Id. ¶ 38. Indeed, Agaj's request was never forwarded to Fr. Penna, who was tasked with reviewing religious exemption requests, because it was never completed. Id. ¶ 36.

Because Agaj refused to provide the information it reasonably requested to evaluate his exemption request, he cannot establish that BC unlawfully failed to accommodate his religious beliefs. See Marsman, 2026 WL 1919552, at *5 (D. Mass. June 17, 2026) ("the reason for Marsman's discharge was his failure to follow the MBTA's procedural rules"); Ortiz-Martinez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 605 (1st Cir. 2017) ("if an employee fails to cooperate in the process, then the employer cannot be held liable . . . for a failure to provide reasonable accommodations.") (internal quotation marks omitted); Chrysler Corp. v. Mann, 561 F.2d 1282, 1285 (8th Cir. 1977) (stating that where the employee refuses to cooperate, "the employee himself is responsible for any failure of accommodation").

**B.    Plaintiff Cannot Establish That His Purported Beliefs Are Religious**

To qualify as a bona fide religious practice, Plaintiff must show "both that the belief or practice is religious and that it is sincerely held." Antredu v. Mass. Dep't of Youth Servs., 729 F.

13

Supp. 3d 76, 82 (D. Mass. Apr. 9, 2024) (quoting EEOC v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49, 55-56 (1st Cir.) "Title VII does not mandate an employer . . . to accommodate what amounts to a 'purely personal preference.'" Munroe v. Bos. Med. Ctr., No. CV 22-11935-FDS, 2024 WL 4203238, at *6 (D. Mass. Sept. 16, 2024) (quoting Unión Independiente, 279 F.3d at 56); see Griffin v. Massachusetts Dep't of Revenue, No. 22-CV-11991-FDS, 2023 WL 4685942, at *4 (D. Mass. July 20, 2023) ("the requirement of a *bona fide* religious belief must have some meaning") (emphasis in original) aff'd sub nom. No. 23-1668, 2026 WL 2018487 (1st Cir. May 26, 2026).

This Court has previously found that "Agaj's first exemption request was insufficient to put Boston College on notice of a bona fide religious practice that conflicted with its COVID-19 vaccine requirement":

> That [first] request asserted, in conclusory fashion, that receiving the vaccine would go "against [ Agaj 's] religi[o]us beli[efs]." See ECF 20, at 7; ECF 20-3, at 2. It did not identify Agaj's religion, nor did it identify "a specific [religious] tenet or principle that does not permit [Agaj] to be vaccinated." *Griffin v. Mass. Dep 't of Revenue*, No. 22-cv-11991-FDS, 2023 WL 4685942, at *7 (D. Mass. July 20, 2023), *appeal pending*, No. 23-1668 (1st Cir.). A "simple ipse dixit by the plaintiff-'this employment requirement conflicts with my religion '-is not sufficient to allege" a claim of religious discrimination. Id. at *6.

ECF 39, p. 6.

While Agaj's second exemption request did identify a religion, it simply states that  the Bogomils religion "forbids me to have a covid-19  vaccine" and "forbits [sic] me to take any thing that risks my health and spiritual wellbeing." SMF ¶ 35. His statements that "[t]he Covid - 19 vaccine is a Health Risk for healthy people" and "it's his duty to keep [his body] pure and free from filth" sound in personal or medical choice. Indeed, Agaj openly contends that COVID-19 vaccine is ineffective and harmful because it "does not protect humans from getting COVID-19", [d]oes not prevent the spread of COVID-19, "[h]as adverse side effects as vaccine; "[o]n healthy

14

individuals is an unnecessary health risk; it "is no longer in recommended for use or authorized

in the USA; and [d]uring [his] employment at Boston College … it was not fully approved only

authorized by FDA, CDS [sic] for emergency use only (EUI)." Id. ¶ 40. These statements[9]

demonstrate that his belief stems from his secular, medical judgment rather than a bona fide

religious belief. See Detwiler v. Mid-Columbia Med. Ctr., 156 F.4th 886, 892 (9th Cir. 2025)

(affirming dismissal of Title VII claim where plaintiff's objection to COVID testing was

grounded on a secular belief that nasal swabs in antigen tests are carcinogenic); Fallon v. Mercy

Cath. Med. Ctr. of Se. Pa., 877 F.3d 487, 492-93 (3d Cir. 2017) (affirming dismissal of Title VII

claim where plaintiff's beliefs that one should not harm their own body and that vaccine did

more harm than good were more medical or moral than religious).

Nor do Agaj's statements that "[m]y body is my Temple it is my duty an obligation to

keep it pure, free from filth" convert his objection to vaccination to one which is religious in

nature. See Ledezma v. Optum Servs., Inc., No. 23-CV-06691-VC, 2025 WL 327743, at *1 (N.D.

Cal. Jan. 29, 2025) (granting summary judgment for employer where plaintiff cited Bible verses

that discuss the body as a temple, but cited no evidence that her belief about the vaccine was

religious); White v. Columbia Sportswear Co., No. 3:24-CV-00006-SB, 2025 WL 4677360, at

*14 (D. Or. Nov. 20, 2025), report and recommendation adopted, No. 3:24-CV-00006-SB, 2026

WL 967325 (D. Or. Apr. 7, 2026) (entering summary judgment for employer where plaintiff

invoked scripture and prayer in attaching religious significance to her objections to vaccination

policy but her opposition stemmed from her personal and medical preferences); see Griffin, 2023

---

[9] His reliance on "Folk Medicine of Ethnobotany" for his medical care further demonstrates his reliance on his personal opinion, not religion, for purposes of his objection to the COVID-19 vaccination. SMF ¶ 35. See Finkbeiner v. Geisinger Clinic, 623 F. Supp. 3d 458, 465–66 (M.D. Pa. 2022) (dismissing Title VII claim and holding that plaintiff's beliefs that tests were "a bad choice for [her] health and body" were medical rather than religious because "it would be a step too far to count everything [a plaintiff] believes about healthy living as a religious practice") (citations omitted).

WL 4685942, at *6 (D. Mass. July 20, 2023) ("a stated claim of religious belief, without more, cannot grant an individual 'a blanket privilege 'to make his own standards on matters of conduct in which society as a whole has important interests.'").

> **C.    Approval of Plaintiff's Request For An Exemption Would Have Caused An Undue Hardship Upon Boston College**

"The undue hardship defense is built into the statutory definition of religion, such that an employment action cannot constitute discrimination on the basis of religion, and an employer cannot be liable under Title VII for religious discrimination, if the undue hardship defense applies." Bazinet, 113 F.4th at 17-18. The Supreme Court has clarified that employers raising an undue hardship defense "must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." Groff v. DeJoy, 600 U.S. 447, 470 (2023). "The undue hardship standard is fact and context specific; it 'requires courts to take into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer.'" Bazinet, 113 F.4th at 18 (quoting Groff, 600 U.S. at 470-71). "Economic and non-economic costs—including health and safety risks, as well as the risk of reputational injury—are relevant." Geronimo, 2025 WL 2050286, at *4 (citing Cloutier, 390 F.3d at 134-37; Cyr v. Bos. Med. Ctr., No. 1:22-CV-11930-JEK, 2025 WL 269239, at *5 & n.4 (D. Mass. Jan. 22, 2025)).

Here, Boston College determined that mandating vaccination for all students, faculty, and staff was the best way to protect against severe illness, hospitalization, and death, and reduce the transmission of COVID-19.  SMF ¶ 17. Its decision was based on scientific studies, opinions and analysis, as well as the recommendation of the Centers for Disease Control and Prevention ("CDC"), the Department of Health and Human Services, and the Massachusetts Department of

16

Public Health. Id. This Court has previously explained that "COVID-19 vaccines protect against infection," lower the risk of adverse consequences in the case of infection, and 'reduc[e] a person's risk of transmitting COVID-19 to others.'" Cyr, 2025 WL 269239 at *6 (quoting Mills, 16 F.4th at 32-33). It has also made clear that when "the record demonstrates that [an employer] relied on the objective, scientific information available to [it], with particular attention to the views of public health authorities," a court will find that the employer "acted reasonably when it determined that vaccinated employees are less likely to transmit COVID-19 than unvaccinated employees." Id. (quoting Rodrique v. Hearst Commc'ns, Inc., 126 F.4th 85, 91 (1st Cir. Jan 17, 2025)). The record here demonstrates precisely that. SMF ¶¶ 16-17, 19-20, 41.

The record also reflects that Agaj's responsibilities required physical labor in enclosed spaces with coworkers, and in proximity of faculty and staff, and students who worked in the Facilities department. SMF ¶ 42; Baldwin Aff. ¶ 6. In fact, he regularly performed tasks with other team members, and frequently shared a vehicle with them. SMF ¶ 10. He also was required to swipe in where over 100 other individuals did, took coffee and lunch breaks in indoor spaces with other individuals, and during colder months, reviewed inventory and equipment indoors along with his co-workers on "shop" days. Id. ¶ 12. Due to the highly transmissible nature of COVID, Agaj, if he became infected, could have readily passed the virus on to other individuals in the Boston College community, who could have then infected others. Allowing Agaj to work unvaccinated in the Fall of 2021 would have increased the likelihood of COVID-19 infection among staff, faculty and students at Boston College. Id. ¶ 47.

"Almost every court to consider the matter . . . agrees that an accommodation which poses a significant health or safety risk to co-workers or other individuals constitutes an undue hardship for purposes of a failure-to-accommodate claim." O'Neal v. King Cnty., No. 2:24-CV-

17

00682-RSL, 2026 WL 860590, at *3 (W.D. Wash. Mar. 30, 2026) (collecting cases). The First

Circuit and multiple cases within have held the same. See Melino v. Bos. Med. Ctr., 127 F.4th

391, 395-96 (1st Cir. 2025) (affirming summary judgment for BMC where granting employee's

requested religious accommodation that she continue working as a registered nurse in ICUs

without being vaccinated for COVID-19 would have posed an undue hardship); Quintal v. Dep't

of Developmental Servs., 761 F. Supp. 3d 350, 355-56 (D. Mass. 2025) (granting summary

judgment for employer where exempting plaintiff from vaccination requirement would impose

an undue hardship because position required in-person site visits to congregate care facilities

serving adults and children); Howe v. Massachusetts Dep't of Correction, No. 4:22-CV-40119-

MRG, 2024 WL 3536830, at *5-6 (D. Mass. July 25, 2024) (granting summary judgment where

allowing plaintiff to continue in his role as corrections officer unvaccinated would have

jeopardized the safety of inmates and staff).[10]

As there is no issue of material fact that Boston College permitting Agaj to continue

working while unvaccinated would have posed a significant risk to other individuals, it has

demonstrated that it could not have accommodated Agaj's request without undue hardship.  See

White , 2025 WL 4677360, at *16-17 (granting summary judgment for employer where

plaintiff's essential duties required indoor work in group settings with co-workers and others);

O'Neal, 2026 WL 860590, at *3 (granting summary judgment for employer where plaintiff's

activities involve regular and unavoidable interactions with co-workers and the public, and use of

confined cab of the light rail vehicle); Bordeaux v. Lions Gate Ent., Inc., 703 F. Supp. 3d 1117,

1135 (C.D. Cal. 2023) (granting summary judgment where "[a]ccommodating Plaintiff's

---

[10] See also Antredu, 729 F. Supp. 3d at 84 (granting summary judgment for employer finding that allowing an unvaccinated employee to remain in plaintiff's position would increase the risk of transmission to residents, staff, and their families); Geronimo, 2025 WL 2050286, at *5-6; Cyr, 2025 WL 269239, at *6.

exemption request would have put the lives of her fellow cast and crew members in danger), aff'd, No. 23-4340, 2025 WL 655065 (9th Cir. Feb. 28, 2025); Beickert v. New York City Dep't of Educ., No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at *5 (E.D.N.Y. Sept. 25, 2023) (finding undue hardship where unvaccinated school teacher would have created a health and safety risk preventing the department from fostering a safe educational and work environment).

Not only did accommodating Agaj's request to work unvaccinated pose a significant health risk to others, but Boston College would necessarily have had to engage in alternative measures to ensure the safety of the Boston College community if it had permitted his -- and all other -- religious exemption requests. Andrade, No. CV 22-11899-FDS, 2025 WL 319563, at *4 (D. Mass. Jan. 13, 2025) ("in determining undue hardship, it is appropriate to consider aggregate effects when multiple employees are granted the same accommodation.") (citing Together Emps. v. Mass Gen. Brigham Inc., 573 F. Supp. 3d 412, 437 (D. Mass. 2021), aff'd, 32 F.4th 82 (1st Cir. 2022)). Those measures would have created a substantial increased cost to Boston College which continued its painstaking efforts taken prior to its vaccination mandate to control the spread of COVID-19 on campus. Boston College would have had to test the unvaccinated individuals 3-4 times a week; test individuals who worked in proximity to them; monitor the test results; track down individuals who missed tests; and separate unvaccinated individuals from other employees, if possible, all at the cost of BC. SMF ¶ 48.

In addition, because the majority of Agaj's work required him to work with a partner for safety purposes, Boston College could not accommodate Agaj by allowing him to work on his own. Id. ¶ 45. Further, removing Agaj from group work would require other landscapers to assume many of his essential duties and increase the burden on them to complete assignments requiring physical labor. id. See Antredu, 729 F. Supp. 3d at 84 (D. Mass. 2024) ("[i]t . . .

imposes an undue burden to require an employer to relieve an employee of her essential job functions and assign them to another employee")(citation omitted); Howe, 2024 WL 3536830, at *5 (finding undue hardship where accommodating unvaccinated correction officer would increase economic costs and require other employees to assume many of his essential duties).[11]

Finally, accommodating Agaj's incomplete request for an exemption had the potential to significantly damage BC's reputation of providing a safe environment for students, faculty and staff to learn, live or work in the midst of the pandemic, particularly in the event of an avoidable outbreak. SMF ¶ 50. See Geronimo, 2025 WL 2050286, at *6 (allowing plaintiff to continue working as a radiologic technologist while unvaccinated would have risked damaging hospital's reputation for furnishing safe medical care); Cyr, 2025 WL 269239, at *6 (same) (citing Cloutier, 390 F.3d at 137; Hall v. Sheppard Pratt Health Sys., Inc., 749 F. Supp. 3d 532, 546-547 (D. Md. 2024), aff'd, 155 F.4th 747 (4th Cir. 2025); Together Emps., 573 F. Supp. 3d at 441)); Antredu, 729 F. Supp. 3d at 84 (department may have also lost the confidence of some clients were they to learn that employees were working with youth while unvaccinated).  Boston College could not have accommodated Agaj's exemption request from its vaccination policy without incurring these significant costs that, taken together, amount to undue hardship.

## CONCLUSION

For these reasons, Boston College respectfully submits that the Court should enter summary judgment in its favor.

---

[11] Cyr, 2025 WL 269239, at *5 n.4 ("'[a]n accommodation may cause undue hardship if it is costly, compromises workplace safety, decreases workplace efficiency, infringes on the rights of other employees, or requires other employees to unwillingly do more than their share of potentially hazardous or burdensome work.'") (quoting U.S. Equal Emp. Opportunity Comm'n, Religious Discrimination, https://www.eeoc.gov/religious-discrimination (last visited Jan. 21, 2025)).

Respectfully submitted,

TRUSTEES OF BOSTON COLLEGE

By its attorneys,

*/s/ Alan D. Rose*
Alan D. Rose (BBO # 427280)
Meredith Wilson Doty (BBO # 652220)
ROSE LAW PARTNERS LLP
185 Dartmouth St., Suite 602
Boston, MA 02116
(617) 536-0040 (Office)
(617) 536-4400 (Fax)
adr@rose-law.net
mwd@rose-law.net

Date: July 21, 2026

## CERTIFICATE OF SERVICE

I hereby certify that I caused this document to be filed through the ECF system and that it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper and/or electronic copies will be sent to those indicated as non-registered participants.

*/s/ Alan D. Rose*
Alan D. Rose

Date: July 21, 2026

21