**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AVENIR AGAJ,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>BOSTON COLLEGE,  )<br><br>Defendant.  ) | Civil Action No. 1:24-CV-10884-JEK |

**DEFENDANT TRUSTEES OF BOSTON COLLEGE'S
CONCISE STATEMENT OF MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant Trustees of Boston College ("Boston College") submits this Concise Statement of Material Facts in support of its Motion for Summary Judgment.

1.     Prior to his employment at Boston College, Mr. Agaj worked at Pine Manor College. After Boston College purchased Pine Manor College, BC interviewed Mr. Agaj and subsequently offered him employment as a landscaper. Affidavit of David Trainor ("Trainor Aff.") ¶ 11.

2.     On or about October 19, 2020, Mr. Agaj was hired by Boston College as a landscaper in the Facilities Management department. Affidavit of Charles Baldwin ("Baldwin Aff.") ¶ 2; ECF 1, ¶ 1; ECF 41 ¶ 1.

3.     Landscapers were deemed essential employees during the pandemic; they remained at work on the Boston College campus, throughout the pandemic, with the exception of a brief period at the beginning of the pandemic when Boston College was locked down. Baldwin Aff. ¶ 5.

4.    Mr. Agaj's job responsibilities were varied. They included general landscape work, cutting grass, hedging, weeding, and snow removal, as well as other tasks which required him to work indoors. One aspect of landscape workers' duties included moving and disposing of furniture, desks, chairs, sofas, and other items, from indoor locations including classrooms. The Facilities Department sends at least two people to the sites for removal and disposal purposes. Baldwin Aff. ¶¶ 4, 10.

5.    A significant part of the duties of landscape workers was event management for meetings, conferences, club gatherings, barbeques, and other activities. Mr. Agaj was a split week worker: he worked on weekends, when there were frequently events that the landscapers worked on. Landscape workers, including Mr. Agaj, were responsible for setting up indoor and outdoor venues for various events held across campus throughout the year. When performing these tasks, Mr. Agaj, and any other landscape workers assigned, would inevitably come in contact with other Boston College staff, students, and/or visitors. For these purposes, landscape workers worked in teams of two people, sometimes four, carrying, placing, and removing tables, chairs, and other equipment for events, and breaking down the equipment post event, picking up trash bags, and traveling together. Baldwin Aff. ¶ 12.

6.    On a daily basis, as part of his responsibilities, Mr. Agaj came into contact with numerous landscape workers indoors and inside his work truck, and with numerous members of the Boston College community. Baldwin Aff. ¶ 6.

7.    Each morning, all union employees were required to "swipe in" and receive daily work assignments from an operations supervisor. The Landscape Services staff comprised approximately twenty-eight people, at least half of whom, including Mr. Agaj, swiped in at 300 Hammond Pond Parkway. In addition, approximately 90 employees from Custodial Services

2

reported to, and departed from the same location, and their supervisors as well as management staff shared that building. Baldwin Aff. ¶ 7.

8.    Landscape operations supervisors conducted team meetings, when necessary, with all of the landscape services staff; these meetings were typically held indoors. Baldwin Aff. ¶ 8.

9.    Throughout the day, the landscape workers, including Mr. Agaj, typically took coffee and lunch breaks at various indoor break rooms across campus. During such breaks, given that people were eating and/or drinking, people were typically unmasked. Baldwin Aff. ¶ 11.

10.    At times during the day, Mr. Agaj travelled by truck between work sites across the campus; as he travelled, Mr. Agaj was often in the truck with one or two other landscape workers. While additional trucks were rented during the pandemic, it was not possible for each landscaper to drive separately for each task. Baldwin Aff. ¶ 9.

11.    The majority of work performed by Mr. Agaj was performed with a partner, in part for safety reasons, or with a group due to the number of people necessary to complete a task. Baldwin Aff. ¶ 15.

12.    During the colder months when temperatures were low, landscape workers, including Mr. Agaj, often worked indoors for "shop" cleanup, which involved reviewing inventory and equipment and organizing supplies. This work was also done in groups. Baldwin Aff. ¶ 13.

13.    Mr. Agaj was required to wear a mask while at work, to engage in social distancing, and was subject to Boston College's COVID-19 testing policies. Facilities employees were requested to follow specific procedures to minimize the spread of COVID. Despite these precautions, employees in Facilities Management were consistently testing positive for COVID

3

prior to the vaccination mandate. One positive test result would generally snowball, leading to one to four landscapers out of work for days. Positive COVID tests were constantly ongoing at this time. Baldwin Aff. ¶ 14.

14.    Once vaccinations became available and Boston College imposed its vaccination requirement, the positive test results dramatically declined by the end of August 2021. Attendance in Facilities Management improved dramatically. Baldwin Aff. ¶ 16.

15.    Boston College committed to providing an in-person education in the midst of the pandemic, representing to its students and their parents that it would follow strict protocols and procedures to maintain a safe environment to do so. See Trainor Aff. ¶ 8 & Exs. 6, 7. Boston College determined that the benefits of in-person education during the pandemic, including the mental health benefits to students, demanded that BC take significant efforts to provide in-person learning. Trainor Aff. ¶ 8.

16.    Prior to the availability of SARS-CoV-2 vaccines, universities, including Boston College, had to implement a wide range of expensive and sometimes disruptive policies (e.g. remote learning, masking, social distancing, limited access to in-person services, testing, isolation and quarantine) in order to contain viral spread on University campuses. Prior to widespread availability of COVID vaccines, mathematical models predicted that high levels of vaccination would be required to contain spread of SARS-CoV-2 and to prevent disease and death on university campuses. Affidavit of Welkin Johnson, Ph.D. ("Johnson Aff.") ¶ 7.

17.    Boston College determined that mandating vaccination for all students, faculty, and staff was the best way to protect against severe illness, hospitalization, and death, and reduce the transmission of COVID-19. Boston College's decision to require students, faculty and staff to be vaccinated against COVID-19 was based on scientific studies, opinions and analysis, as well

4

as the recommendation of the federal Centers for Disease Control and Prevention ("CDC"), the United States Department of Health and Human Services, and the Massachusetts Department of Public Health that vaccination was the best way to protect against severe illness, hospitalization, and death, and reduce the transmission of COVID-19. Johnson Aff. ¶ 6.

18.    Vaccination was particularly important on college campuses like Boston College, given the close proximity in which students, faculty and staff interact on a daily basis and the sheer number of individuals in its community. In 2021, Boston College had in excess of 15,000 students and 3,500 faculty and staff.  Johnson Aff. ¶ 8.

19.    In April 2021, the Delta variant rapidly caused a new wave of COVID-19 infections, with cases rising sharply from April/May 2021 and displacing the previous Alpha variant to become the primary strain by July 2021. The Delta variant was designated as a Variant of Concern (VOC) by the Centers for Disease Control and the World Health Organization in May 2021. The Delta variant was roughly 60% more transmissible than the Alpha variant and twice as likely to cause hospitalization, especially in unvaccinated individuals. It spread faster, caused severe disease more quickly, and carried mutations that partially evaded immunity, resulting in higher breakthrough infections. A Delta variant breakthrough infection occurred when a fully vaccinated person (≥14 days post-vaccination) tests positive for SARS-CoV-2. While Delta's high viral load made these infections more common, vaccines remained highly effective at preventing severe illness, hospitalization, and death. Johnson Aff. ¶ 9.

20.    In reliance on scientific studies and guidance from public health authorities, Boston College imposed a mandatory vaccination policy on April 23, 2021. Affidavit of Patricia Lowe ("Lowe Aff.") ¶ 4; Johnson Aff. ¶ 6. On April 23, 2021, Boston College first announced that, in order to "promot[e] the health and safety of our campus community and surrounding

5

neighborhood . . . the University will require all students, faculty, and staff to be fully vaccinated (with FDA-approved vaccines) against COVID-19 before participating in any on campus activity related to the 2021-2022 academic year." Lowe Aff., ¶ 4 & Ex. 1. That announcement further stated that exceptions would be granted for legitimate religious and medical reasons. Lowe Aff., Ex. 1.

21.    On May 10, 2021, Vice President of Human Resources, David Trainor, sent an email to the BC community, which reiterated BC's vaccine mandate for the 2021-2022 academic year. It explained that, "The University will consider medical or religious exemptions from the mandatory vaccination requirement, and guidelines and procedures for such requests will be communicated in the coming days." See Trainor Aff., Ex. 1.

22.    On May 13, 2021, Mr. Trainor sent another email to the BC Community, describing the steps to provide proof of vaccination. It explained, "Exemptions will be granted for legitimate religious and medical reasons. To request an exemption, please fill out the COVID-19 Vaccination Exemption Request Form which can be found on the Office for Institutional Diversity website." See id., Ex. 2.

23.    The form to request an exemption from the University's vaccine mandate was placed on the OVPHR website, which was then called the Office for Institutional Diversity and later merged with OVPHR. Patricia Lowe, the Associate Vice President of the OVPHR and the University Title IX and ADA Coordinator, and Edilma-Hosein Reyes, the Assistant Director of the OID at the time, were tasked with administering the process of reviewing and making decisions on exemption requests. Lowe Aff. ¶ 6.

24.    Employees seeking a religious exemption were required to submit information supporting their request, including an explanation of the basis for their sincerely held religious

6

belief and supporting documentation, such as a letter from the applicant's pastor, spiritual advisor, or other faith leader. Lowe Aff. ¶ 7. Employees seeking a medical exemption were required to submit a letter from the applicant's treating physician, stating that vaccination was contraindicated by the applicant's medical condition. BC denied requests for exemption by applicants who declined to provide documentation. Id.

25.     On May 28, 2021, Mr. Trainor sent an email to the BC Community, informing everyone of two deadlines: August 13, 2021, to be fully vaccinated if returning to campus before classes resumed, and August 1, 2021, to submit a request to the Office of Institutional Diversity for a COVID-19 vaccination exemption. Trainor Aff. ¶ 4 & Ex. 3.

26.     On June 23, 2021, Mr. Agaj filled out and emailed to Boston College's Office for Institutional Diversity his exemption request. Lowe Aff. ¶ 8. The request form gave employees the ability to choose whether an exemption was for "Medical," "Religious," or "Other special circumstance." Mr. Agaj selected all three. Id. ¶ 9. In the box for describing special circumstances, Mr. Agaj wrote, "l) It would have an adverse effect on my immune system on medium and long term not to mention immediate side effects 2) It goes against my religius belives faith healing 3) As long as idemnity for vaccines is in place i dont feel safe having one [sic]" In the box which requested medical or religious documentation and any additional information, Mr. Agaj wrote, "Please grant me exemption for the reasons stated above[.]" Lowe Aff. Ex. 2. Agaj's exemption request did not identify his religion. Id.

27.     On June 23, 2021, upon receipt of Mr. Agaj's request form, Ms. Reyes emailed Mr. Agaj at 10:24 AM:

> Thank you for your email and request form. For medical exemptions, please provide, at minimum, a letter from your healthcare provider that clearly states the contraindication to vaccination. For religious documentation, please provide

a letter from your spiritual leader or advisor that clearly states the religious reasoning for exemption.

Lowe Aff. ¶ 11 & Ex. 3.

28. At 10:28 AM on June 23, Mr. Agaj responded to Ms. Reyes' email, stating, "Your request is in clear violation of my rights i dont have to provide you further info on my health records disability act religius belives nor anything else for that matter have a nice day [sic]." Lowe Aff. ¶ 12 & Ex. 3.

29. At 11:01 AM on June 23, Mr. Agaj sent Ms. Reyes a second email that day, stating:

> Hi Your request to provide documents about my medical record or religious belives violates my rights under disability act 151B religius freedoms ACLU and privacy laws 1B chapter 214 Title 1 Part 3. Frankly you should not demand that i provide proof. Please recpect my rights! Have a nice day Avenir Agaj [sic].

Lowe Aff. ¶ 13 & Ex. 4.

30. At 11:12 AM on June 23, Mr. Agaj sent Ms. Reyes a third email that day, stating: "HI Your request to ask me to provide physical proof of vaccination Is In clear violation of the disability act 151 B, Religlus fredom act RFRA Privacy law 1B chapter 214 title 1 Part 3. Please respect my rights. Have a nice day Avenir Agaj [sic]." Lowe Aff. ¶ 14 & Ex. 5.

31. When Ms. Lowe reviewed Mr. Agaj's request for exemption, on June 24, 2021, and saw that he had been asked to provide documentation but had declined to provide it, she emailed Mr. Agaj that BC did not have sufficient information to make a decision. Lowe Aff. ¶ 15 & Ex. 5. She advised him that Title VII permitted BC to request supporting documentation and requested that he provide documentation because BC could not, "effectively evaluate [his]

8

exemption request without some explanation or documentation of the nature of [his] medical or religious belief and how it applies to the vaccine requirements." Lowe Aff. ¶ 15 & Ex. 5.

32.    On June 30, 2021, Ms. Reyes sent a "gentle reminder" to Mr. Agaj that he had not submitted supporting documentation, and that if documentation were not received in five days, BC would deny his request. Lowe Aff., ¶ 16 & Ex. 6.

33.    Mr. Agaj replied to this request for supporting documentation by stating that Ms. Reyes' email was not a gentle reminder, but an "ULTIMATUM [sic]. Rest assure I will take action ageist any retaliation and denial of my request for vaccination exemption [sic]." Lowe Aff. ¶ 17 & Ex. 6.

34.    On July 8, 2021, the Office for Institutional Diversity emailed Mr. Agaj telling him that his request for an exemption to the University's vaccination requirements has been denied, as "the Information [he] provided does not adequately support a religious exemption". Lowe Aff., ¶ 19 & Ex. 7.

35.    Two weeks later, on July 26, 2021, Mr. Agaj submitted a new request for exemption. Lowe Aff., ¶ 20. In the section of the form which asked applicants to describe their special circumstance for requesting an exemption, Mr. Agaj wrote:

> Please grant me an exemption because i rely only on Folk Medicine of Ethnobotany and Religious Prayer for my medical care. I Do Declare that my sincere relgious held beliefs as practicant ,believer and descendant of the faith of BOGOMILS, which forbids me to have a covid-19 Vaccine. The way the covid -19 vaccine is made and distributed goes against my Faith and Morals.

Lowe Aff., Ex. 8. In the section of the form which requested supporting medical or religious documentation and any additional information, Mr. Agaj wrote:

> The Covid -19 vaccine is a Health Risk for healthy people. My religious belives as BOGOMIL forbits me to take any thing that risks my health and spiritual wellbeing. My body is my Temple it is my duty an obligation to keep it pure,

9

free from filth. May i also remind you again of my rights under the 1St Amendment also of Aticle 9 of The Human Rights act 1998 and the bill of rights. Please Grant Me The Covid -19 Vaccine Exemption.

Id.

36.    Mr. Agaj did not include any supporting documents with his new request. BC had previously informed him of the documentation requirement, and declined his request because he had refused to produce supporting documentation. Lowe Aff. ¶ 20. Because Mr. Agaj's request was not complete, it was not forwarded to Fr. Penna, who was tasked with reviewing religious exemption requests. Lowe Aff. ¶ 20; Affidavit of Fr. Anthony Penna ("Penna Aff.") ¶ 8. Mr. Agaj's July 26 exemption form was the first time he referred to ethnobotany or his Bogomils religion. Lowe Aff. ¶ 20.

37.    On August 6, 2021, Mr. Trainor emailed Mr. Agaj informing him that his vaccination exemption request was denied. Trainor Aff., Ex. 4. Trainor stated that "[d]enials of exemption were based on a number of factors, including inadequate information or explanation of the basis for the request, and the undue hardship that would follow from permitting unvaccinated faculty and staff on campus, with potentially serious health consequences for all members of the Boston College community." Id. Trainor's message also informed Mr. Agaj that if he chose to be vaccinated, Mr. Agaj needed to submit proof of vaccination by August 13, 2021; if Mr. Agaj failed to provide proof of vaccination, he would no longer be permitted on campus. Trainor Aff. ¶ 5. Mr. Agaj did not get vaccinated. Trainor Aff. ¶ 6.

38.    On August 13, 2021, BC's deadline by which all students, faculty, and staff were required to upload proof of vaccination, Mr. Agaj's vaccination status was still outstanding, and

10

BC had not received any supporting documentation for his exemption request. Trainor Aff. ¶ 6; Lowe Aff. ¶ 22.

39.    Mr. Agaj was subsequently terminated on August 19, 2021. Trainor Aff. ¶ 6; Lowe Aff. Ex. 9.

40.    According to his Interrogatory Response, Mr. Agaj's personal belief is that COVID-19 vaccine is ineffective and harmful because it "does not protect humans from getting COVID-19", [d]oes not prevent the spread of COVID-19, "[h]as adverse side effects as vaccine; "[o]n healthy individuals is an unnecessary health risk; he "believe[s] it is no longer in recommended for use or authorized in the USA; [d] uring [his] employment at Boston College I believe it was not fully approved only authorized by FDA, CDS for emergency use only (EUI)." Affidavit of Meredith Doty ("Doty Aff."), Ex. 1 (Int. Response), No. 4.

41.    As a result of Boston College's vaccination policy, Boston College achieved an ~99.3% vaccination rate among students, faculty, and staff. A fully vaccinated community was essential to Boston College's mission to continue to provide an in-person education to its students during the pandemic. Studies demonstrate that the closer to 100% vaccination rate a community achieves, the better the chances of eliminating spread of the COVID-19 virus. For example, if a community is 95% vaccinated, 1 out of every 20 individuals is potentially at risk of spreading COVID-19. In this situation, gatherings of 20-100 people will include on average 1-5 unvaccinated individuals. By comparison, if the same community reaches a 99% vaccination rate, on average only one person in a gathering of 100 people would be at risk of carrying and spreading the virus, and most smaller groups will have 0-1 individuals with the potential to carry and spread the virus. Groups of this size range (20-100 people) form regularly on university campuses, in spaces that include (but are not limited to) classrooms and lecture halls,

11

laboratories, dormitories, cafeterias, libraries, waiting rooms, break rooms, workshops, recreational facilities, shuttle buses and bus stops, and administrative office suites. A campus community is also dynamic, with students, faculty and staff moving within and between spaces and assembling into new groups throughout the day. Under such circumstances, even a small increase in vaccination rates (from 95% to 99%) can translate into a significant reduction in the risk of infection and disease. The high vaccination rate at Boston College lessened the spread of infections among those on campus, and likely lessened hospitalizations and serious illness among those who became infected. Johnson Aff. ¶ 10.

42.    As part of his responsibilities, Mr. Agaj came into contact, in enclosed spaces, with numerous members of the Boston College community, including faculty, staff and students who worked in the Facilities department. He regularly performed tasks with other team members, the majority of which required physical activity. The performance of such physical activities increases the risk of potential transmission due to increased breathing and sweating. Potential transmission also increases with other factors often associated with physical work, such as an inability to wash hands frequently due to working in a location removed from restrooms or faucets. As of 2021, there was also a concern about surface transmission or COVID-19; that is, the possibility that individuals could become infected by contacting the same commonly touched surface as infected individuals. Johnson Aff. ¶ 12; Baldwin Aff. ¶ 6.

43.    Due to the highly transmissible nature of COVID, Mr. Agaj, if he became infected, could have readily passed the virus on to other individuals in the Boston College community, who could have then infected others. Contact tracing, which is aimed at notifying individuals of potential exposure and preventing further transmission, has limited effectiveness and generally only prevents a fraction of onward transmissions from contacts. Because it only

takes one person to set off a chain of transmission, the risk of having just one person who can transmit the virus poses a significant risk to other individuals. This was especially true given the breakthrough infections caused by the Delta variant. Johnson Aff. ¶ 13.

44.     To accommodate Mr. Agaj's request to work unvaccinated, Boston College would necessarily have had to engage in alternative measures to ensure the safety of the Boston College community, though none of those measures would be likely as successful as vaccination. These measures would have created a substantial increased cost to Boston College, particularly considering the increased risk of COVID-19 infection at the time of Mr. Agaj's termination. For example, alternative measures such as repeated testing; monitoring Mr. Agaj's compliance with masking or social distancing; keeping Mr. Agaj fully separated from immunocompromised individuals; and strategically coordinating and/or limiting the number of individuals with whom Mr. Agaj worked would require Boston College to expend significant time and resources and disrupt the work of his department. Baldwin Aff. ¶ 17; Johnson Aff. ¶ 13; Trainor Aff. ¶ 8-9.

45.     As the majority of Mr. Agaj's work required him to work with a partner for safety purposes, Boston College could not accommodate Mr. Agaj by allowing him to work on his own. Baldwin Aff. ¶ 17. Further, removing Mr. Agaj from group work would require other landscapers to assume many of his essential duties and increase the burden on them to complete assignments requiring physical labor. Id.

46.     If Mr. Agaj were to remain on campus unvaccinated in the Fall of 2021, he would have posed a safety and health risk to individuals with whom he worked directly at Boston College, to the other staff members with whom he worked, and to the greater Boston College community. Johnson Aff. ¶ 12.

47.     Allowing Mr. Agaj to work unvaccinated would have caused an undue hardship to Boston College because it would have increased the likelihood of COVID-19 infection among staff, faculty and students at Boston College. Johnson Aff. ¶ 12; Lowe Aff. ¶ 25; Baldwin Aff. ¶ 18.

48.     Approximately 40 employees applied for religious exemptions from the vaccine requirement. If BC had granted all 40 exemptions, the University would have incurred increased costs and burdens to ensure the employees did not transmit the virus. BC would have needed to test these individuals for COVD-19 3-4 times per week, as well as test any person in proximity to an unvaccinated individual. During the pandemic, BC hired temporary nurses to take the swabs, and BC tracked individuals who missed tests. BC then sent all employee swabs to the Broad Institute for processing to maintain confidentiality and ensure that no employee processed another employee's test. Had approximately 40 more employees been unvaccinated on-campus, BC would have had increased testing costs. Trainor Aff. ¶ 9.

49.     In addition, BC would have needed to arrange for these unvaccinated employees to be separated from others, which was an increased challenge for employees whose jobs required movement around campus. BC would have needed to inform unvaccinated employees' supervisors, while maintaining the privacy of the unvaccinated employees' vaccination status. Trainor Aff. ¶ 9.

50.     The risk of potential outbreak to the BC community – particularly where one could be avoided by vaccination – posed considerable non-economic costs to the University. Boston College committed to providing an in-person education in the midst of the pandemic, representing to its students and their parents that it would follow strict protocols and procedures to maintain a safe environment to do so. See Trainor Aff., Exs. 6, 7. Vaccination was an essential

component to ensure a protected environment. Accommodating Mr. Agaj's incomplete request for an exemption had the potential to drastically undermine the faith those community members had entrusted in the school. If current and prospective students and their parents no longer trusted the University to provide the necessary environment for learning – due to an avoidable breakout – BC would have faced enormous reputational cost. Moreover, avoidable breakouts of deadly infections would expose the University to litigation risk. Trainor Aff. ¶ 8; Johnson Aff. ¶ 14.

Respectfully submitted,

TRUSTEES OF BOSTON COLLEGE

By its attorneys,

*/s/ Alan D. Rose*
Alan D. Rose (BBO # 427280)
Meredith Wilson Doty (BBO # 652220)
ROSE LAW PARTNERS LLP
185 Dartmouth St., Suite 602
Boston, MA 02116
(617) 536-0040 (Office)
(617) 536-4400 (Fax)
adr@rose-law.net
mwd@rose-law.net

Date: July 21, 2026

15

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I caused this document to be filed through the ECF system and that it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper and/or electronic copies will be sent to those indicated as non-registered participants.

_/s/ Alan D. Rose_
Alan D. Rose

Date: July 21, 2026