# EXHIBIT   2



# BOSTON COLLEGE

OFFICE OF THE FINANCIAL VICE PRESIDENT AND TREASURER

## Boston College
## Financial Statement Summary
## 2020-2021

The Fiscal 2021 Boston College ("the University") financial statements illustrate a year of unprecedented net asset growth and balance sheet strength, despite ongoing challenges imposed by the enduring global pandemic. Diligent stewardship of University resources and careful containment of unanticipated pandemic related expenses result in a positive operating bottom line for the fiscal year.

The financial statements also reflect a historic endowment return contributing in excess of $1.1 billion to the University's balance sheet as well as government support provided though the CARES Act, used for student aid and University support to off-set COVID-19 related expenses and lost revenue.

Also, of note, in June of 2020, the University entered into an integration agreement with Pine Manor College ("PMC"). This agreement, uniting the two institutional missions of serving underrepresented, first-generation, low-income students, resulted in Boston College assuming ownership of PMC's approximately 50-acre campus as well as all other assets and liabilities. Additionally, Boston College established the Pine Manor Institute for Student Success, designating $50.0 million of existing endowment funds to provide academic support and outreach programs. The University's financial statements reflect the consolidation of PMC, including an inherent contribution recorded in the nonoperating section of the statement of activities, which reflects the appraised value of assets in excess of liabilities.

The following discussion and analysis provide additional commentary and data related to the financial performance of Boston College for the fiscal year ended May 31, 2021.

**Statement of Financial position (Total Assets, Liabilities, and Net Assets)**

The University's total assets at May 31, 2021 were $6.4 billion, which was $1,236.3 million or 24% higher than at the end of the previous fiscal year. The increase was largely attributable to growth in the investments due to growth in the

129 LAKE, SUITE 540, 140 COMMONWEALTH AVENUE, CHESTNUT HILL, MA 02467
TEL: 617-552-3387

University's endowment, coupled with the generosity of our donors who provided $63.6 million in contributions to the endowment.

Also contributing to the University's increase in assets in Fiscal 2021 was growth in property, plant and equipment. The increase was largely driven by the integration of PMC as well as significant construction projects on campus, including the Pete Frates Center at Harrington Athletics Village and Integrated Science Center, offset by the annual increase to accumulated depreciation.

Total liabilities amounted to $1.6 billion at May 31, 2021, a decrease of $38.1 million. This decrease was primarily a result of annual debt service payments of $31.5 million.

The resulting total net assets, the equivalent of the University's net worth, totaled $4.8 billion as of May 31, 2021, an increase of $1,274.5 million or 36% during the fiscal year.

**Statement of Activities**

**Operating Results**

The University's total operating revenues grew $20.0 million or 2% over Fiscal 2020. This overall growth is in large part attributable to the strength of the University's enrollments contributing $23.4 million or 5% growth in the tuition and fees revenue line.

Cost containment measures continued to remain in place in Fiscal 2021 resulting in minimal expense growth of $20.0 million or 2% over the previous fiscal year. This increase was primarily driven by costs associated with COVID-19 including personal protective equipment, testing, and isolation housing.

The University's increase in net assets from operating activities, (operating revenues in excess of operating expenses), of $160 thousand shows consistency with our previous fiscal year and reflects solid operating results despite the challenges of returning to campus following the COVID-19 pandemic shutdown in Fiscal 2020.

**Non-Operating Results**

The University's net assets increased $1.3 billion from non-operating activities in Fiscal 2021. This was primarily driven by the University's investment return. The University also recorded an inherent contribution from the acquisition of PMC, representing the appraised value of assets in excess of liabilities assumed pursuant to the integration agreement. The use of $132.6 million in non-operating assets to support University operations results in the net overall increase from non-operating activities in Fiscal 2021.

**Looking ahead**

As detailed above, Boston College enters the Fiscal 2022 from a position of strength. A history of consistent, positive operating results combined with a strong liquidity profile, comprehensive planning, and diligent stewardship of resources, have enabled the University to continue to thrive amidst the formidable challenges brought on by the global pandemic.

As always, but now more than ever, the University continues to focus on operating efficiencies, sustainability, resource conservation, and expense management to help ensure that resources are devoted to the highest strategic priorities.

Support The Heights
Click here to donate



For a Greater Boston College
Independent Since 1970

E-EDITION | NEWS | SPORTS | ARTS | OPINIONS | NEWTON | MAGAZINE | MULTIMEDIA | BLACK HISTORY MONTH 2025

Home



HEIGHTS NEWSLETTER

'THE HEIGHTS'
NEWSLETTER
UPDATES THREE
TIMES A WEEK
CLICK HERE TO SUBSCRIBE

SPONSORS

Search ...

SEARCH

# BC Endowment Increases by $1.2 Billion in Past Year

By Erin Shannon

October 8, 2021  Updated October 12, 2021 at 2:17 pm

.....................

Boston College's endowment grew by almost $1.2 billion—or 46 percent—to reach a total of $3.8 billion in the past fiscal year. The large gains reflect significant returns on BC's investments, according to the Boston Business Journal.

In a statement to *The Heights*, University Spokesman Jack Dunn attributed the endowment increase to the work of a variety of BC staff and committees.

"Boston College's return on its endowment during the past year, ending June 30th, was 46.4%, which is attributable to excellent leadership by the Investment and Endowment Committee of the Boston College Board of Trustees and BC's Chief Investment Officer John Zona," Dunn wrote.

BC's gains in the past year—from June 2020 to June 2021—are 19 percent higher than the median endowment gains for colleges in the United States, which were 27 percent, according to Bloomberg.

"The investment results, on top of an infusion of federal stimulus funds, are a welcome financial balm for schools that have grappled with revenue declines as the pandemic curtailed enrollment," the article reads.

also emphasized the endowment increase and federal funds the University received during COVID-19.

"The financial statements also reflect a historic endowment return contributing in excess of $1.1 billion to the University's balance sheet as well as government support provided through the CARES Act, used for student aid and University support to off-set COVID-19 related expenses and lost revenue," the statement reads.

Despite these drastic updates to many colleges'—including BC's—endowments, many colleges won't be likely to update their budgets in the upcoming year, according to Bloomberg.

"Still, the one-year gains may not have much of an impact on university budgets," the article reads. "That's because spending plans are typically determined by longer-term average investment returns of three to five years."

*Featured Graphic by Olivia Charbonneau / Heights Editor*

| endowment | finance |
| --- | --- |

*October 8, 2021*

Green Newton Promotes Use of Electric          Thumbs Up, Thumbs Down: Week Of Oct.

## YOU MAY ALSO LIKE







Newton Approves Use of Grant Money for Human Resources Study

BC Names Finance Department in Honor of Trustee Marc Seidner After Major Donation

BC Unlikely to Consider Fossil Fuel Divestment, UGBC Senator Shares

Copyright © 2024 The Heights. All rights reserved.

# THE ⬤ HEIGHTS
### Est. 1919 - Independent Since 1970

NEWS
SPORTS
ARTS
MAGAZINE
NEWTON
OPINIONS

of 2

2/23/25 18:

Click here to don



Saturday,
August 8, 2026

*For a Greater Boston College*

Independent Since 1970



MORE

News     On Campus

# FEMA Announces $7.4 million in Reimbursements for BC's COVID-19 Testing Costs

Erin Shannon • September 23, 2022



(Nicole Vagra / Heights Editor)

The Federal Emergency Management Agency (FEMA) announced on Tuesday it will award more than $4 million to reimburse Boston College for the cost of testing students, faculty, and staff for COVID-19 between August 2020 and January 2022.

"FEMA is pleased to be able to assist Boston College with these costs," FEMA Region 1 Regional Administrator Lori Ehrlich said in the release. "Providing resources for our institutions of higher education to combat the COVID-19 pandemic is critical to their success, and to our success as a nation."

The public assistance grants, which total $4,055,605, compensate the University for the price of administering 195,435 COVID-19 tests during that period.

FEMA also announced in August it would send more than $3.3 million to BC for testing costs between January and May 2021—reimbursing the University about $7.4 million in total.

According to Jack Dunn, associate vice president for University communications, final approval for reimbursement for fall 2020 and 2021 testing is still pending.

"The tests were eligible under the COVID-19 Federal Disaster Declaration and subsequent extensions / expansions by both President Trump and President Biden," said Dunn and Assistant Treasurer Travis Looker. "The program is not specific to BC, and many of our peers (Harvard, Holy Cross, Brown) have recently been approved for these reimbursements as well."

FEMA's public assistance program is used to aid states and communities recovering from a federal disaster or emergency, according to the release. Former President Donald Trump declared COVID-19 a national emergency on March 13, 2020.

The Sept. 20 release states that FEMA has provided almost $1.3 billion overall in public assistance grants to Massachusetts for pandemic-related costs.

"The FEMA component is part of a larger federal effort to provide relief to universities and students, including programs directly earmarked for financial aid," Dunn and Looker said. "This reimbursement will be used to offset the testing expenses incurred during that semester. We expect to receive payout of the funds in the coming weeks."

# FEMA Awards More Than $3.3 Million to Boston College for COVID-19 Testing Costs

**Release Date: August 29, 2022**

**BOSTON** – The Federal Emergency Management Agency will be sending more than $3.3 million to the Commonwealth of Massachusetts to reimburse Boston College for the cost of testing students, faculty and staff during the COVID-19 pandemic.

The $3,311,550 Public Assistance grant will reimburse the private Jesuit research university in Chestnut Hill for the cost of administering 132,462 tests between January and May 2021.

"FEMA is pleased to be able to assist Boston College with these costs," said FEMA Region 1 Regional Administrator Lori Ehrlich. "Providing resources for our institutions of higher education to combat the COVID-19 pandemic is critical to their success, and to our success as a nation."

FEMA's Public Assistance program is an essential source of funding for states and communities recovering from a federally declared disaster or emergency.

So far, FEMA has provided more than $1.2 billion in Public Assistance grants to Massachusetts to reimburse the commonwealth for pandemic-related expenses.

 **FEMA**

Page 1 of 1

# FEMA Awards More Than $4 Million to Boston College for COVID-19 Testing Costs

**Release Date: September 20, 2022**

**BOSTON** – The Federal Emergency Management Agency will be sending more than $4 million to the Commonwealth of Massachusetts to reimburse Boston College for the cost of testing students, faculty and staff during the COVID-19 pandemic.

The $4,055,605 in Public Assistance grants will reimburse the private Jesuit research university in Chestnut Hill for the cost of administering 195,435 tests between August 2020 and January 2022.

"FEMA is pleased to be able to assist Boston College with these costs," said FEMA Region 1 Regional Administrator Lori Ehrlich. "Providing resources for our institutions of higher education to combat the COVID-19 pandemic is critical to their success, and to our success as a nation."

FEMA's Public Assistance program is an essential source of funding for states and communities recovering from a federally declared disaster or emergency.

So far, FEMA has provided nearly $1.3 billion in Public Assistance grants to Massachusetts to reimburse the commonwealth for pandemic-related expenses.

 **FEMA**

Page 1 of 1

# FEMA Awards Over $2.2 Million to Boston College for COVID Testing Staff Costs

**Release Date: November 14, 2023**

The Federal Emergency Management Agency will be sending more than $2.2 million to the Commonwealth of Massachusetts to reimburse Boston College for the cost of testing students, staff and faculty during the COVID-19 pandemic.

The $2,222,370 Public Assistance grant will reimburse the private Jesuit research university in Chestnut Hill for the cost of hiring extra staff and paying existing staff to operate the school's inhouse testing program between July 2020 and June 2021.

Boston College set up its own testing program that included both collection sites at its three campuses as well as a testing laboratory that was able to process over 5,000 tests per day and deliver results within 24 hours.

To staff the laboratory, the college hired a lab technologist, lab technician, lab supervisor & assistant director, lab manager, senior lab technologist, and bio automation specialist & lab manager, who were part of a team of 54 employees who worked at total of 64,098 regular hours and 453 overtime hours.

"FEMA is pleased to be able to assist Boston College with these costs," said FEMA Region 1 Regional Administrator Lori Ehrlich. "Reimbursing state, county, and municipal governments – as well as eligible non-profits and tribal entities – for the costs incurred during the COVID-19 pandemic is an important part of our nation's ongoing recovery."

FEMA's Public Assistance program is an essential source of funding for states and communities recovering from a federally declared disaster or emergency.

So far, FEMA has provided more than $2.5 billion in Public Assistance grants to Massachusetts to reimburse the commonwealth for pandemic-related expenses.

 FEMA

Page 1 of 1

# Higher Education Emergency Relief Fund (HEERF)

## Higher Education Emergency Relief Funds (HEERF, CARES Act, American Rescue Act Plan)

### HEERF III Funds, or The American Rescue Plan (ARP)

The American Rescue Act was signed into law on March 11, 2021 and contains funding for higher education. Boston College received its HEERF III Grant award notification on May 17, 2021 and in accordance with the requirements of the ARP(a)(1), no less than $8,715,557 will be used to provide emergency financial aid grants to students.

Following the American Rescue Plan regulatory guidance, Boston College has prioritized the awarding of HEERF III funds to students with exceptional need, such as students who receive Pell Grants. Boston College had a total of 15,409 students enrolled for the fall 2021 semester. As of December 31, 2022, from the $8,715,557 of the student portion of the HEERF III funding, Boston College distributed grants of up $4,500 to 2,159 undergraduate students with the highest demonstrated financial need as calculated by the FAFSA to cover expenses related to the disruption of campus operations due to the COVID pandemic for a total of $7,437,357. Specifically, these grants were given to undergraduate students whose family contribution toward educational expenses as calculated by the FAFSA was $22,000 or less during the 2021–2022 academic year. Boston College has also distributed grants of up to $1,000 to 1,418 graduate and law students with the highest demonstrated financial need, as calculated by the FAFSA, to cover expenses related to the disruption of campus operations due to the COVID pandemic for a total of $1,278,200. Specifically, these grants were given to those graduate students whose family contribution toward educational expenses, as calculated by the FAFSA, was $10,000 or less during the 2021–2022 academic year.

As of March 28, 2023, Boston College's total allocation of the HEERF III student portion has been fully expended.

## HEERF II (CRRSAA)

On December 27, 2020, federal legislation was signed into law that, among other initiatives, created a second funding program, HEERF II, or CARES Act II. Boston College received its HEERF II Grant award notification on January 17, 2021. In accordance with the requirements of CRRSAA and ARP(a)(1) and (a)(4) programs, no less than $3,224,288 will be used to provide emergency financial aid grants to students.

Boston College had a total of 14,843 students enrolled for the spring 2021 semester. Per CRRSAA rules, Boston College has prioritized the awarding of HEERF II funds to students with exceptional need, such as students who receive Pell Grants. As of March 30, 2022, from the $3,224,288 of the student portion of the HEERF II funding, Boston College has distributed grants of up to $2,000 to undergraduate students with the highest demonstrated financial need as calculated by the FAFSA to cover expenses related to the disruption of campus operations due to the COVID pandemic for a total of $2,848,688. Specifically, these grants were given to 1,590 undergraduate students whose family contribution toward educational expenses as calculated by the FAFSA was $10,000 or less during the 2020–2021 academic year. Boston College has also distributed grants of $500 to 751 graduate and law students with the highest demonstrated financial need, as calculated by the FAFSA, to cover expenses related to the disruption of campus operations due to the COVID pandemic for a total of $375,600. Specifically, these grants were given to those graduate students whose family contribution toward educational expenses, as calculated by the FAFSA, was $0 during the 2020–2021 academic year.

As of June 21, 2022, Boston College's total allocation of the HEERF II student portion has been fully expended.

## CARES Act I, or HEERF I

The Coronavirus Aid, Relief, and Economic Security (CARES) Act established an approximately $14b Higher Education Emergency Relief Fund (HEERF), which allocated 75% of the funding to institutions of higher education based on the number of each institution's Pell Grant recipients and the remaining 25% based upon each institution's remaining total student's Full-Time Enrollment. Under this metric, Boston College was allocated approximately $6.4m. Pursuant to the CARES Act, institutions are obligated to use at least half of their allocated funding for emergency student financial aid grants. The remaining portion of an institution's CARES Act funding may be used for certain other expenses relating to the disruption of campus operations due to COVID-19. The Department of Education has made the student portion of this CARES Act funding available first.

As a condition to receiving the emergency student financial aid portion of its CARES Act funding, the University signed and returned to the Department of Education a Certification and Agreement affirming that Boston College will, in accordance with the requirements of the CARES Act, use no less than 50% of its total CARES Act funding to provide emergency financial aid grants to students. That Certification was signed by Boston College on June 5, 2020. On August 6, Boston College received the approval to receive the funding from the Department of Education and the funds will be received by the institution in late August.

higher Education Emergency Relief Fund (HEERF) - Student...    https://www.bc.edu/bc-web/offices/student-services/coronav

Per the CARES Act, this portion can only be distributed to students who are eligible to participate in federal financial aid programs under Section 484 in Title IV of the Higher Education Act of 1965, were enrolled for the full spring semester and were not enrolled in a fully online program. Boston College had 6,680 students who submitted a Free Application for Federal Student Aid (FAFSA) for the spring 2020 semester, 4,683 of whom were undergraduates. As of late August 2020, from the $3,224,288 of the student portion of the CARES Act funding, Boston College has distributed grants of up to $2,000 to 1,579 undergraduate students with the highest demonstrated financial need as calculated by the FAFSA to cover expenses related to the disruption of campus operations in the Spring of 2020 due to the COVID pandemic for a total of $2,837,643. Specifically, these grants were given to undergraduate students whose family contribution toward educational expenses as calculated by the FAFSA, was $10,000 or less during the 2019–2020 academic year. Boston College has also distributed grants of up to $550 to 703 graduate and law students with the highest demonstrated financial need, as calculated by the FAFSA, to cover expenses related to the disruption of campus operations due to the COVID pandemic for a total of $386,645. Specifically, these grants were given to those graduate students whose family contribution toward educational expenses, as calculated by the FAFSA, was $0 during the 2019–2020 academic year.

As of April 29, 2021, the CARES Act student funding has been disbursed. Boston College's total allocation of the student portion has now been fully expended.

**First Published:** 8/24/2020
**Second Update:** 10/27/2020
**Third Update:** 12/22/2020
**Fourth Update:** 4/10/2021
**Fifth Update:** 5/12/2021 **FINAL** Cares Act I, HEERF I
**Sixth Update:** 6/11/2021
**Seventh Update:** 7/9/2021
**Eighth Update:** 10/6/2021
**Ninth Update:** 12/9/2021
**Tenth Update:** 1/7/2022
**Eleventh Update:** 3/30/2022
**Twelfth Update:** 6/21/2022 **FINAL** HEERF II
**Thirteenth Update:** 10/5/2022
**Forteenth Update:** 1/5/2023
**Fifteenth Update:** 3/28/2023

## Quarterly Reports

- March 29, 2021 Quarterly Report (PDF)
- June 30, 2021 Quarterly Report (PDF)
- October 10, 2021 Quarterly Report (PDF)
- January 10, 2022 Quarterly Report (PDF)
- March 31, 2022 Quarterly Report  (https://www.bc.edu/content/dam/bc1/offices /student-services/heerf/Quarterly-Report-as-of-03-31-2022.pdf)(PDF)
- July 7, 2022 Quarterly Report (https://www.bc.edu/content/dam/bc1/offices/student-services/heerf/00212800_June_2022_HEERF_Quarterly_Reporting_Form_070722.pdf) (PDF)
- October 5, 2022 Quarterly Report (https://www.bc.edu/content/dam/bc1/offices /student-services/heerf /002128_September_2022_HEERF_Quarterly_Reporting_Form_Submit_10.04.22.pdf) (PDF)
- January 5, 2023 Quarterly Report (PDF)
- March 28, 2023 Quarterly Report (PDF)

**Office of Student Services**
Lyons Hall 103
Phone: 617-552-3300 or 800-294-0294
studentservices@bc.edu (mailto:studentservices@bc.edu)

**f** (https://www.facebook.com/BCstserv) **🐦** (https://twitter.com/bc_studentserv)
**📷** (https://www.instagram.com/bcstudentserv)



140 Commonwealth Avenue

Chestnut Hill, MA 02467



Copyright © 2024 Trustees of Boston College

LONDONDERRY, NH 03053

~~L.A.N. 7200000~~
August 21, 2021

## Claimant Information

Claimant Name:        Avenir Agaj
Employer Name:        BOSTON COLLEGE
                      140 COMMONWEALTH AVE
                      CHESTNUT HILL, MA 02467

Employment Start Date:    10/19/2020
Employment End Date:      8/12/2021
Work Schedule:            Full Time
Job Title:                Landscaping and Groundskeeping

## Part 1

1    What was the claimant's employment history with you (the employer)? (*Check one*)

☑ The claimant worked for you (the employer). Go to **Question 2**.

☐ The claimant did not work for you (the employer). Go to **Part 3**.

2    Did the claimant's employment end due to **lack of work**?        ☐ Yes  ☑ No

(A **Yes** answer means you (the employer) are giving up your right to challenge this claim.)

2A    If *Yes*, go to **Part 3**.

CHARLES F. HURLEY BUILDING • 19 STANIFORD STREET • BOSTON, MA 02114
www.mass.gov/dua

3    Was the claimant fired (discharged) because of **poor job performance** (*not* for misconduct or for disobeying a rule or policy)?      ☐ Yes  ☑ No

(A **Yes** answer means you (the employer) are giving up your right to challenge this claim.)

3A    If *Yes*, go to **Part 3**.

4    List the claimant's duties:

not provided _____

5    Date claimant was fired (discharged):                8/31/2021 _____

6    Who fired (discharged) the claimant? *Name/s and position/s*:

not provided _____

7    Why was the claimant fired (discharged)?

discharge no covid vaccine _____

8    What was the last incident that caused you (the employer) to fire the claimant?

discharge no covid vaccine _____

8A    Date of last incident:

n/a _____

## Part 2

1    Did this claimant work for you (the employer)?                ☑ Yes  ☐ No

1A    If *No*, provide any information you may have about this person's claim for benefits, then go to **Part 3**.

2    Was the claimant fired (discharged)?    ☑ Yes  ☐ No

2A    If *Yes*, why was the claimant was fired (discharged)?

discharge no covid vaccine

2B    If *No*, explain why the claimant no longer works for you (the employer), then go to **Part 3**.

3    What was the last incident that caused you (the employer) to fire the claimant?

discharge no covid vaccine

Date:

n/a

4    Was the claimant fired (discharged) for something s/he *did* or *did not* do?    ☑ Yes  ☐ No

4A    If *Yes*:

-    What proof do you (the employer) have (if any) that s/he did that **on purpose**?

discharge no covid vaccine

-    What reason(s) did the claimant give for what s/he did?

discharge no covid vaccine

-    If you (the employer) were **harmed** by what s/he did, explain how:

n/a

-    How did the claimant know that what s/he did would harm you (the employer)?

CHARLES F. HURLEY BUILDING • 19 STANIFORD STREET • BOSTON, MA 02114
www.mass.gov/dua

n/a
_____

- Did the claimant know s/he might be disciplined for doing that?

yes
_____

5 Was the claimant fired (discharged) for disobeying (violating) a company rule or policy?    ☐ Yes  ☑ No

5A If *Yes*:

- What rule or policy did s/he disobey (violate)?

_____

- Why do you (the employer) have that rule or policy?

_____

- What happens to an employee who disobeys (violates) that rule? For example, would s/he be warned, suspended, or fired (discharged)?

_____

- Did the claimant know about the rule or policy?    ☐ Yes  ☐ No

o If *Yes*:

~ **When** did the claimant find out about that rule or policy?

_____

~ **How** did the claimant find out about that rule or policy?

_____

*Provide a copy of the rule or policy, if it is in writing.*

*Provide the claimant's acknowledgment of the rule or policy, if any.*

CHARLES F. HURLEY BUILDING • 19 STANIFORD STREET • BOSTON, MA 02114
www.mass.gov/dua

6    Was the claimant given any **previous** written or spoken (verbal) warnings about this?    ☐ Yes  ☑ No

6A    If *No*, did the claimant know s/he might get fired (discharged) for this?    ☑ Yes  ☐ No

-    If *Yes*:

    o    **How** did s/he know?

        new policy

    o    **When** did s/he find out?

        new policy

6B    If *Yes*, describe the **last** warning:

-    Date of **last** warning:

-    Reason for **last** warning:

-    Who gave the warning? *Name/s and position/s*:

-    What did the warning say?

-    Did the warning say the claimant could be fired (discharged) if this problem happened again?    ☐ Yes  ☐ No

    o    If *No*, why not?

*If the warning was in writing, provide a copy.*

7    Was the claimant given any **other** warning(s)?                    ☐ Yes  ☑ No

7A   If *Yes*:

-    Date(s) of other warning(s):

     _____

-    Reason(s) for other warning(s):

     _____

-    Who gave the warning(s)? *Name/s and position/s*:

     _____

-    What did the warning(s) say?

     _____

     *If any warning was in writing, provide a copy.*

8    If another employee did the same thing, was s/he treated in the same way?    ☑ Yes  ☐ No

8A   If *No*, explain:

     _____

## Part 3

1    List any **other** information you want us to consider about this issue:

n/a_____

*Failure to provide detailed responses and all relevant information may result in the loss of appeal right(s) and/ or relief of charges.*

2    Do you want to send us any documents?                                     ☐ Yes  ☑ No

2A    If *Yes*:

We will send you a cover sheet that you can use to send us those documents. We will send it to you using the method you said you prefer (mail or email).

3    Describe the documents that you will send:

_____

4    Person to contact if we need more information:

*Name*:          angela turrin

*Position*:      claims rep

*Phone number*:  9374121035

5    Tell us about the person filling out this form.

*Name*:          angela turrin

*Position*:      claims rep

*Phone number*:  9374121035

☑ I certify **under penalty of perjury** that the above information is true and correct.

CHARLES F. HURLEY BUILDING • 19 STANIFORD STREET • BOSTON, MA 02114
www.mass.gov/dua

Hearings Department
North Regional Hearings Office
360 Merrimack St.
Bldg. 9, 3rd Fl, Entrance I
Lawrence, MA 01843
Ph: (978) 738-4400
Fax: (617) 727-0895
TDD:  711

## DECISION



## I.    STATUTORY PROVISION(S) AND ISSUE(S) OF LAW:

**MGL Chapter 151A, §§25(e)(1) & (e)(2)** - Whether there is substantial and credible evidence to show that the claimant left work voluntarily with good cause attributable to the employer or its agent, or involuntarily for urgent, compelling and necessitous reasons, or by discharge for deliberate misconduct in willful disregard of the employing unit's interest, or for a knowing violation of a reasonable and uniformly enforced policy or rule, unless the violation was the result of the employee's incompetence.

## II.    FINDINGS OF FACT:

1.    The claimant worked full time as a Level III landscaper for the employer, a private university, from October 19, 2020 until August 13, 2021.

2.    In June of 2021, the employer sent an e-mail to all employees suggesting that they become vaccinated against the COVID-19 virus.  The vaccination was not a requirement of continued employment at the time.  Employees were given the opportunity to submit an exemption based upon a medical or religious exemption in lieu of obtaining the vaccine.

3.    The claimant has a sincerely held religious belief in a named religion which prevents him from receiving medicines, including vaccinations, which are not found in nature.  The claimant has always followed his religion and has not received other vaccinations in the past.

4.    On June 23, 2021, the claimant submitted a request for an exemption to the employer's human resources department ("HR") based on his religious beliefs.  The request for an exemption was denied.

ISSUE ID: ~~0073252105~~

5.    In July 2021, the employer implemented a mandatory vaccination policy as a condition of continued employment where all employees of the university must be vaccinated against the COVID-19 virus or be approved for either a medical or religious exemption by August 13, 2021.  The employer advised employees of its COVID-19 vaccination policy by e-mail in July of 2021.

6.    The purpose of the policy was to protect the university's employees, students, faculty and public at large from the spread of the COVID-19 virus.

7.    The claimant became aware of the COVID-19 vaccination policy when he received the e-mail the employer sent to all employees in July 2021.

8.    The employer does not require any other vaccinations as a condition of employment or continued employment.

9.    The employer had an expectation that employees will be fully vaccinated, or have an approved exemption, by August 13, 2021.

10.   The employer communicated its expectation to employees via the e-mail sent in July of 2021.

11.   In July of 2021, the claimant spoke to the manager of facilities about the change in the vaccination policy from suggested to mandatory.  The manager of facilities advised the claimant to submit a second exemption request to HR.

12.   On July 25, 2021, the claimant submitted a second request for exemption from the COVID-19 vaccination policy to HR.

13.   The claimant did not receive a response or decision to his second exemption request.

14.   On August 5, 2021, the claimant received an e-mail from the vice president of HR which stated, in pertinent part, "… Being fully vaccinated by August 13th is a condition of employment and required in order to return to campus this fall. Any employee who is not fully vaccinated will not be permitted to enter the campus after 5:00pm on Friday, August 13th. Human Resources will follow up with individuals who are not in compliance the week of August 16th."

15.   On August 6, 2021, the claimant received an e-mail from the vice president of HR which stated, in pertinent part, "As you are aware, the University permitted employees to request exemption from the vaccination requirement for bona fide religious and medical reasons. The University reviewed all requests for exemption. Denials of exemption were based on a number of factors, including inadequate information or explanation of the basis for the request, and the undue hardship that would follow from permitting

unvaccinated faculty and staff on campus, with potentially serious health consequences for all members of the [employer's] community. As you know from previous communications, [the employer] denied your request for an exemption from the vaccination requirement. We urge you to join the many thousands of your colleagues at [the employer] who have chosen to be vaccinated."

16.    On August 13, 2021, the claimant received an e-mail from the vice president of HR which stated, in pertinent part, "As of close of business today (August 13, 2021), you have failed to upload proof of a vaccine. As such, effective August 14, 2021, you are NOT authorized to access [the employer's] campus or your work space. Your respective vice president or dean has been informed that you have failed to comply with the University's requirement as of this time. Human Resources will be in contact with you directly during the week of August 16, 2021 to determine next steps. In the meantime, you are not to come to campus. If you have any questions or believe this email was sent to you in error, please email [HR department]."

17.    On August 16, 2021, the claimant called the HR director to inquire about his employment status and the director told the claimant he had been terminated on August 13, 2021 for failing to comply with the employer's COVID-19 vaccine requirements.

## III.    CONCLUSIONS AND REASONING:

A hearing was conducted by telephone.  The claimant attended the hearing, the employer did not attend.

The claimant did not leave work voluntarily because he was told he was terminated by the employer on August 13, 2021.  Therefore, Section 25(e)(1) is not applicable.

In accordance with Section 25(e)(2) of the Law, the burden of proof is upon the employer to establish by substantial and credible evidence that the discharge of the claimant was attributable to deliberate misconduct in willful disregard of the employing unit's interest, or for a knowing violation of a reasonable and uniformly enforced rule or policy of the employer, unless the violation was the result of the employee's incompetence.

Based upon the evidence presented, the employer has not met its burden.

The employer has a policy regarding a requirement that all employees be vaccinated against the COVID-19 virus or have an approved exemption as of August 13, 2021.  The policy is reasonable in that it is intended to protect the employer's staff, students, and the public from the COVID-19 virus.  The employer did not submit a copy of the policy to the department, nor do the e-mails submitted by the claimant provide information sufficient to determine if the policy is uniform on its face or in its application to the claimant or other employees.  As such, the employer cannot establish that it discharged the claimant for a knowing violation of a reasonable and uniformly enforced policy or rule.

ISSUE ID: ~~[redacted]~~

The employer also failed to show the claimant was discharged for deliberate misconduct in willful disregard of the employing unit's interest. During the hearing, the claimant testified he was aware of the employer's expectation regarding the COVID-19 vaccination and did not believe he had ever acted in a manner contrary to the employer's interest. The claimant explained that by submitting the second request for an exemption within the permitted time frame he was complying with the employer's expectation. Since the employer's e-mail of August 6, 2021 does not indicate which exemption request was denied, the claimant assumed the e-mail was referencing the first request because he had not yet received notice that the second request had been approved or denied. As such, the claimant lacked the required state of mind to deliberately act against the employer's interest, as he believed his second exemption request was still under review. The employer did not offer testimony disputing the testimony of the claimant.

In view of the evidence, the employer has not met its burden of proof in establishing the claimant was discharged for deliberate misconduct in willful disregard of the employer's interests, or for a knowing violation of a reasonable and uniformly enforced policy or rule within the meaning of Section 25(e)(2) of the law. Therefore, the claimant is eligible for unemployment benefits.

## IV.    DECISION:

The determination is reversed.

The claimant is entitled to benefits beginning August 8, 2021, if otherwise eligible.

**HEARINGS DEPARTMENT**

**By:    Karen Iovaine**

**REVIEW EXAMINER**

**NOTE: DUA changed its debit card provider in 2022. If your payment is set to Debit Card, please go to your UI Online account to review, or update your payment method. Visit www.mass.gov/dua for more information.**

**COPIES TO:**
Claimant
Employer
File