# EXHIBIT 2

**Senator Chuck Grassley, Ranking Member**
**Questions for the Record**
**Ms. Julia Eleanor Kobick**
**Nominee to be United States District Judge, District of Massachusetts**

1. **In *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, you authored an amicus brief on behalf of Massachusetts arguing that there should be no religious or moral exemptions to the contraception mandate for employers, including religious organizations. Could you please explain why you argued that the contraception mandate was necessary as applied to nuns?**

   Response: In my capacity as Assistant Attorney General for the Commonwealth of Massachusetts, I co-authored an amicus brief on behalf of Massachusetts, 19 other states, and the District of Columbia in support of the respondents in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020). The brief supported Pennsylvania and New Jersey's arguments that the religious and moral exemption rules promulgated by the federal agencies exceeded the scope of the agencies' authority under the Affordable Care Act, 42 U.S.C. § 300gg-13(a)(4), and did not satisfy the procedural requirements of the Administrative Procedure Act. The Supreme Court disagreed, holding that the rules were within the scope of the agencies' authority under the Affordable Care Act and comported with the Administrative Procedure Act. If confirmed, I would fully and faithfully apply the Court's decision and holding in *Little Sisters*.

2. **Who should respond to a domestic violence call where there is an allegation that the aggressor is armed—the police or a social worker?**

   Response: The question whether a police officer or social worker should respond to a domestic violence call where there is an allegation that the aggressor is armed is a question for policy makers. Consistent with the Code of Conduct for United States Judges, it would not be appropriate for me, as a judicial nominee, to share personal views, if any, on that question.

3. **Is it appropriate for protestors to ignore social distancing mandates and gathering limitations to protest racial injustice?**

   Response: In accordance with the Code of Conduct for United States Judges, it would not be appropriate for me, as a judicial nominee, to share personal views, if any, on whether it is appropriate for protesters to ignore social distancing mandates and gathering limitations to protest racial injustice. If any case were to come before me concerning social distancing mandates, gathering limitations, and/or the First Amendment, I would impartially and faithfully apply all relevant Supreme Court and First Circuit precedent.

4. **Is it appropriate for the government to use law enforcement to enforce social distancing mandates and gathering limitations for individuals attempting to practice their religion in a church, synagogue, mosque or any other place of religious worship?**

Commission's Advisory Sentencing Guidelines, and I worked with the Rules and Guidelines while serving for three years as a law clerk, I have not, to my recollection, had occasion to cite to either compilation during my work as Assistant Attorney General or as Deputy State Solicitor. If confirmed, I would ensure that I am well versed in the Rules and the Guidelines before presiding over any criminal proceeding.

11. **Should judicial decisions take into consideration principles of social "equity"?**

Response: I am not familiar with the definition of "social equity." Black's Law Dictionary defines "equity" as "fairness; impartiality; even-handed dealing." Black's Law Dictionary 619 (9th ed. 2004). Judicial decisions should be fair and impartial.

12. **What is implicit bias?**

Response: I generally understand the concept of implicit bias to refer to a form of bias or cognitive heuristic that occurs unconsciously and automatically, and that can affect judgments, decisions, and behaviors.

13. **Is the federal judiciary affected by implicit bias?**

Response: I understand the concept of implicit bias to refer to biases or judgments that operate below the level of an individual's conscious awareness. The question whether an institution, like the federal judiciary, is affected by implicit bias is a systemic question most appropriate for policy makers to consider. If confirmed, I would work to ensure that my decisions are free from bias, including by diligently reviewing the record, carefully considering arguments, writing thoroughly reasoned decisions, engaging with colleagues and parties with the spirit of open-mindedness, and adhering to procedural requirements and precedent. And I would strive to treat all who come into my courtroom equally and fairly, as individuals.

14. **Do you have any implicit biases? If so, what are they?**

Response: I understand the research on implicit bias to demonstrate that all people, myself included, have implicit biases that operate below the level of conscious awareness. If confirmed, I would work to ensure that my decisions are free from bias, including by diligently reviewing the record, carefully considering arguments, writing thoroughly reasoned decisions, engaging with colleagues and parties with the spirit of open-mindedness, and adhering to procedural requirements and precedent. And I would strive to treat all who come into my courtroom equally and fairly, as individuals.

15. **How do you distinguish between "attacks" on a sitting judge and mere criticism of an opinion he or she has issued?**

Response: The First Amendment protects the right to criticize public officials. *See New York Times v. Sullivan*, 376 U.S. 254, 269-71 (1964). The speech rights safeguarded by the First Amendment reflect America's "national commitment to the principle that debate

on public issues should be uninhibited, robust, and wide-open." *Id.* at 270. At the same time, the Supreme Court has recognized that "the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy," and that "it is of the utmost importance that the administration of justice be absolutely fair and orderly." *Cox v. Louisiana*, 379 U.S. 559, 562 (1965).

16. **Do you think the Supreme Court should be expanded?**

Response: The question whether the Supreme Court should be expanded is a question for policy makers. It would not be appropriate for me, as a judicial nominee, to comment on the size of the Supreme Court. If I were confirmed, I would be bound by Supreme Court precedent, and I would fully and faithfully apply that precedent.

17. **Which of the four primary purposes sentencing—retribution, deterrence, incapacitation, and rehabilitation—do you personally believe is the most important? Which of these principles, if confirmed, will guide your approach to sentencing defendants?**

Response: If confirmed, I would apply the factors set forth in 18 U.S.C. § 3553(a) whenever I sentence a defendant. That statute requires the court to consider, among other things, "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). Each of these factors would guide my approach to sentencing.

18. **In what situation(s) does qualified immunity not apply to a law enforcement officer in Massachusetts?**

Response: Law enforcement officials are entitled to qualified immunity from individual-capacity claims for damages so long as "'their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Whether qualified immunity can be invoked depends on the 'objective legal reasonableness' of the official's act." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Harlow*, 457 U.S. at 819). Each assertion of qualified immunity must be analyzed individually and "depends very much on the facts of each case." *Brousseau v. Haugen*, 543 U.S. 194, 201 (2004).

19. **Do you believe that local governments should reallocate funds away from police departments to other support services? Please explain.**

Response: The allocation of funds to police departments and support services is a matter for policy makers to consider. In accordance with the Code of Conduct for United States

Response: It is generally not appropriate for me, as a judicial nominee, to comment on whether a Supreme Court decision was correctly or incorrectly decided, when it is possible that a related issue may come before the courts. The Supreme Court's decision in *District of Columbia v. Heller* is binding precedent, and I would apply it fully and faithfully.

h. **Was *McDonald v. City of Chicago* correctly decided?**

Response: It is generally not appropriate for me, as a judicial nominee, to comment on whether a Supreme Court decision was correctly or incorrectly decided, when it is possible that a related issue may come before the courts. The Supreme Court's decision in *McDonald v. City of Chicago* is binding precedent, and I would apply it fully and faithfully.

i. **Was *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* correctly decided?**

Response: It is generally not appropriate for me, as a judicial nominee, to comment on whether a Supreme Court decision was correctly or incorrectly decided, when it is possible that a related issue may come before the courts. The Supreme Court's decision in *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* is binding precedent, and I would apply it fully and faithfully.

j. **Was *New York State Rifle & Pistol Association v. Bruen* correctly decided?**

Response: It is generally not appropriate for me, as a judicial nominee, to comment on whether a Supreme Court decision was correctly or incorrectly decided, when it is possible that a related issue may come before the courts. The Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* is binding precedent, and I would apply it fully and faithfully.

k. **Was *Dobbs v. Jackson Women's Health* correctly decided?**

Response: It is generally not appropriate for me, as a judicial nominee, to comment on whether a Supreme Court decision was correctly or incorrectly decided, when it is possible that a related issue may come before the courts. The Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* is binding precedent, and I would apply it fully and faithfully.

25. **How do you understand the difference, if any, between freedom of religion and freedom of worship?**

Response: I do not understand the Supreme Court to have drawn a distinction between the freedom of religion and the freedom of worship for purposes of the Free Exercise Clause of the First Amendment. The Supreme Court has described the right protected by

the Free Exercise Clause as both the "free exercise of religion" and the "freedom of worship." *See, e.g.*, *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) ("The Free Exercise Clause of the First Amendment protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 450 (1988))); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942) (explaining that the "freedom of worship" is a fundamental right made applicable to the States by the Fourteenth Amendment (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940))). Government regulations that burden religious exercise and are not "neutral and generally applicable" trigger strict scrutiny under the Free Exercise Clause. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam).

26. **Do you believe that the federal government should decriminalize possession of any drugs?**

    Response: The question whether the federal government should decriminalize possession of any drug is a question for policy makers. In accordance with the Code of Conduct for United States Judges, it would not be appropriate for me, as a judicial nominee, to share personal views, if any, on that question.

27. **Do you agree that the First Amendment is more often a tool of the powerful than the oppressed?**

    Response: If confirmed, my personal views regarding the First Amendment would play no role in my judicial decision-making. If an issue concerning the First Amendment were to arise, I would be bound by, and would adhere to, the relevant Supreme Court and First Circuit precedent.

28. **What legal standard would you apply in evaluating whether or not a regulation or statutory provision infringes on Second Amendment rights?**

    Response: In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court clarified the methodology applicable to the review of Second Amendment claims. First, a court must assess whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If so, "the Constitution presumptively protects that conduct." *Id.* The government then bears the burden of "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearms regulation." *Id.* To make that showing, the government must identify an historical analogue that is "relevantly similar" to the challenged regulation. *Id.* at 2132. If confirmed, I would apply this methodology in any Second Amendment case.

29. **Demand Justice is a progressive organization dedicated to "restor[ing] ideological balance and legitimacy to our nation's courts."**

    a. **Has anyone associated with Demand Justice requested that you provide any services, including but not limited to research, advice, analysis, writing or giving speeches, or appearing at events or on panels?**

**SENATOR TED CRUZ**
**U.S. Senate Committee on the Judiciary**

**Questions for the Record for Julia Kobick, nominated to be United States District Judge for the District of Massachusetts**

## I. Directions

Please provide a wholly contained answer to each question. A question's answer should not cross-reference answers provided in other questions. Because a previous nominee declined to provide any response to discrete subparts of previous questions, they are listed here separately, even when one continues or expands upon the topic in the immediately previous question or relies on facts or context previously provided.

If a question asks for a yes or no answer, please provide a yes or no answer first and then provide subsequent explanation. If the answer to a yes or no question is sometimes yes and sometimes no, please state such first and then describe the circumstances giving rise to each answer.

If a question asks for a choice between two options, please begin by stating which option applies, or both, or neither, followed by any subsequent explanation.

If you disagree with the premise of a question, please answer the question as-written and then articulate both the premise about which you disagree and the basis for that disagreement.

If you lack a basis for knowing the answer to a question, please first describe what efforts you have taken to ascertain an answer to the question and then provide your tentative answer as a consequence of its reasonable investigation. If even a tentative answer is impossible at this time, please state why such an answer is impossible and what efforts you, if confirmed, or the administration or the Department, intend to take to provide an answer in the future. Please further give an estimate as to when the Committee will receive that answer.

To the extent that an answer depends on an ambiguity in the question asked, please state the ambiguity you perceive in the question, and provide multiple answers which articulate each possible reasonable interpretation of the question in light of the ambiguity.

## II. Questions

1. **Is racial discrimination wrong?**

Response: Yes. Congress has passed a number of statutes, like Title VII of the Civil Rights Act of 1964, that prohibit discrimination on the basis of race. The Supreme Court has also long held, for purposes of the Equal Protection Clause of the Fourteenth Amendment and the equal protection component of the Fifth Amendment, that race-based classifications are subject to strict scrutiny, and therefore must be narrowly tailored to a compelling government interest. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

2. **Are there any unenumerated rights in the Constitution, as yet unarticulated by the Supreme Court that you believe can or should be identified in the future?**

Response: Should any case come before me concerning unenumerated rights in the Constitution, either a right that has been identified by the Supreme Court or one that a party contends should be identified, I would follow the test set forth in *Washington v. Glucksberg*, 521 U.S. 702 (1997). Under that test, "the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' *id.* at 503 (plurality opinion); *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934) ('so rooted in the traditions and conscience of our people as to be ranked as fundamental'), and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed,' *Palko v. Connecticut*, 302 U.S. 319, 325, 326 (1937)." *Washington*, 521 U.S. at 720-21.

3. **How would you characterize your judicial philosophy? Identify which U.S. Supreme Court Justice's philosophy out of the Warren, Burger, Rehnquist, and Roberts Courts is most analogous with yours.**

Response: The role of an Article III judge is to fairly and impartially resolve the case or controversy before her. I would approach each case cognizant of the limits on judicial power, with an open mind, and with humility. In every case, I would consult the relevant precedent from the Supreme Court and First Circuit. I would carefully review the factual record, the parties' written submissions, and the parties' arguments. I would engage with the parties respectfully and work diligently to determine how the law applies to the facts of the case. In writing decisions, I would strive to explain my reasoning clearly, so that the parties and the public understand why the law requires a particular outcome.

Although I am not familiar with the judicial philosophies of all of the Justices on the Warren, Burger, Rehnquist, and Roberts Courts, I had the great fortune to serve as a law clerk to Justice Ruth Bader Ginsburg from 2012 to 2013. During that year, I admired how the Justices on the Court engaged with their colleagues respectfully and worked every day to uphold the rule of law. I would strive to bring those attributes to my work as a judge.

4. **Please briefly describe the interpretative method known as originalism. Would you characterize yourself as an 'originalist'?**

Response: Black's Law Dictionary defines "originalism" as the "theory that the U.S. Constitution should be interpreted according to the intent of those who drafted and adopted it." Black's Law Dictionary 1210 (9th ed. 2004). I would not characterize my approach to

14. **Is it ever permissible for the government to discriminate against religious organizations or religious people?**

Response: Please see my response to Question 13.

15. **In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Roman Catholic Diocese of Brooklyn and two Orthodox Jewish synagogues sued to block enforcement of an executive order restricting capacity at worship services within certain zones, while certain secular businesses were permitted to remain open and subjected to different restrictions in those same zones. The religious organizations claimed that this order violated their First Amendment right to free exercise of religion. Explain the U.S. Supreme Court's holding on whether the religious entity-applicants were entitled to a preliminary injunction.**

Response: The Supreme Court held that the religious-entity applicants in *Roman Catholic Diocese* were entitled to a preliminary injunction of the executive order pending appeal and disposition of any petition for a writ of certiorari, because they established a likelihood of success on the merits on their Free Exercise claim, they demonstrated that they would suffer irreparable harm absent injunctive relief, and they demonstrated that the public interest would not be harmed if injunctive relief were awarded. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam). With respect to the likelihood of success on the merits, the Court first concluded that the challenged capacity restrictions were likely not neutral because they "single[d] out houses of worship for especially harsh treatment." *Id. at* 66. And because the restrictions were not neutral and of general applicability, they were subject to strict scrutiny. *Id.* at 67. The Court held that the capacity restrictions were not likely to survive that rigorous standard of review because there were less restrictive alternative policies available that could have prevented the spread of COVID-19. *Id.*

16. **Please explain the U.S. Supreme Court's holding and rationale in *Tandon v. Newsom*.**

Response: In *Tandon v. Newsom*, the Supreme Court granted the application for injunctive relief pending appeal or disposition of any petition for a writ of certiorari. 141 S. Ct. 1294 (2021) (per curiam). The Court enjoined state restrictions imposed on private gatherings during the COVID-19 pandemic, concluding that the restrictions were not neutral and generally applicable because they treated comparable secular activity more favorably than at-home religious gatherings, and therefore triggered strict scrutiny under the Free Exercise Clause. *Id.* at 1296-97. The Court held that the applicants were likely to succeed on the merits of their Free Exercise claim and that the other equitable factors warranted an injunction pending appeal. *Id.* at 1297.

17. **Do Americans have the right to their religious beliefs outside the walls of their houses of worship and homes?**

Response: Yes.

18. **Explain your understanding of the U.S. Supreme Court's holding in *Masterpiece Cakeshop v. Colorado Civil Rights Commission*.**

Response: In *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, the Supreme Court considered whether the Colorado Civil Rights Commission's application of

the Colorado Anti-Discrimination Act to a bakery comported with the Free Exercise Clause of the First Amendment. 138 S. Ct. 1719 (2018). The Colorado Civil Rights Commission had determined that the refusal of the petitioner, a bakery business, to provide wedding cakes to same-sex couples on the basis of religious beliefs violated the Act, which prohibits discrimination in places of public accommodation on the basis of protected characteristics, including sexual orientation. *Id.* at 1726. The Supreme Court held that the Colorado Civil Rights Commission's consideration of the case exhibited hostility to religion and therefore violated the state's duty under the Free Exercise Clause "not to base laws or regulations on hostility to a religion or religious viewpoint." *Id.* at 1731.

19. **Under existing doctrine, are an individual's religious beliefs protected if they are contrary to the teaching of the faith tradition to which they belong?**

Response: The Supreme Court has explained that "'religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'" *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021) (quoting *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707, 714 (1981)). So long as a person's religious beliefs are sincere, they are protected, even if those beliefs are not based on teachings of the faith tradition to which they belong. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 686 (2014); *Frazee v. Illinois Dep't of Employment Security*, 489 U.S. 829, 834 (1989).

a. **Are there unlimited interpretations of religious and/or church doctrine that can be legally recognized by courts?**

   Response: Please see my response to Question 19.

b. **Can courts decide that anything could constitute an acceptable "view" or "interpretation" of religious and/or church doctrine?**

   Response: Please see my response to Question 19.

c. **Is it the official position of the Catholic Church that abortion is acceptable and morally righteous?**

   Response: I am not familiar with the official positions of the Catholic Church, nor, as a judicial nominee, would it be appropriate for me to comment on the positions of a religious institution.

20. **In *Our Lady of Guadalupe School v. Morrissey-Berru*, the U.S. Supreme Court reversed the Ninth Circuit and held that the First Amendment's Religion Clauses foreclose the adjudication of employment-discrimination claims for the Catholic school teachers in the case. Explain your understanding of the Court's holding and reasoning in the case.**

Response: *Our Lady of Guadalupe School v. Morrissey-Berru* concerned the ministerial exception, rooted in the Free Exercise and Establishment Clauses of the First Amendment, to laws governing the employment relationship between certain employees and religious institutions. 140 S. Ct. 2049, 2055 (2020). To determine whether the ministerial exception applies to an employment discrimination claim brought by an employee of a religious institution, the Court explained, "a variety of factors may be important." *Id.* at 2063. Those factors may include the employee's title, the role of the employee in elucidating tenets of

the faith, and the substance of the employee's work. *Id.* at 2064 ("What matters, at bottom, is what an employee does."). Applying those factors to the cases at hand, the Supreme Court concluded that the employees, both elementary school teachers at Catholic schools, "performed vital religious duties," and therefore could not assert employment discrimination claims against their religious employers. *Id.* at 2066-69.

21. **In *Fulton v. City of Philadelphia*, the U.S. Supreme Court was asked to decide whether Philadelphia's refusal to contract with Catholic Social Services to provide foster care, unless it agrees to certify same-sex couples as foster parents, violates the Free Exercise Clause of the First Amendment. Explain the Court's holding in the case.**

Response: In *Fulton v. City of Philadelphia*, the City of Philadelphia had stopped referring children to Catholic Social Services, a private foster care agency, because, due to its religious beliefs about same-sex marriage, the agency would not certify same-sex couples to be foster parents. 141 S. Ct. 1868, 1874 (2021). Catholic Social Services brought suit, contending that the City's policy violated its rights under the Free Exercise Clause. *Id.* at 1876. The Supreme Court held that the City's refusal to contract with Catholic Social Services burdened the organization's religious beliefs and did not constitute a generally applicable policy. *Id.* at 1878-81. The policy was, therefore, subject to strict scrutiny, and it failed that rigorous standard of review because the City's asserted governmental interests could not justify denying Catholic Social Services an exemption from the City's non-discrimination policies. *Id.* at 1882.

22. **In *Carson v. Makin*, the U.S. Supreme Court struck down Maine's tuition assistance program because it discriminated against religious schools and thus undermined Mainers' Free Exercise rights. Explain your understanding of the Court's holding and reasoning in the case.**

Response: In *Carson v. Makin*, the Supreme Court held that Maine's tuition assistance program, under which parents living in districts without a public high school could direct state-funded subsidies to secular private schools, but not to religious private schools, violated the Free Exercise Clause of the First Amendment. 142 S. Ct. 1987 (2022). The Court reaffirmed the principle that "a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Id.* at 1996. And it held that Maine's tuition assistance program, which disqualified private schools based on their religious character, ran afoul of that principle and could not satisfy strict scrutiny. *Id.* at 1997-98.

23. **Please explain your understanding of the U.S. Supreme Court's holding and reasoning in *Kennedy v. Bremerton School District.***

Response: After the plaintiff in *Kennedy v. Bremerton School District*, a high school football coach employed by a public school district, prayed quietly after three football games, the school district put him on paid administrative leave and barred him from further participation in football activities. 142 S. Ct. 2407, 2418-19 (2022). The plaintiff contended that the school district's action violated his rights under the Free Speech and Free Exercise Clauses of the First Amendment. *Id.* at 2419. The Supreme Court agreed. It first concluded, for purposes of the Free Exercise claim, that the school district's action was not in accordance with a neutral or generally applicable policy because it targeted the plaintiff's conduct based on its religious character. *Id.* at 2422-23. It next concluded, for purposes of the free speech claim, that the plaintiff's prayers constituted private speech, not speech

(2015)).

I was not counsel for the Commonwealth when the case was briefed and argued in the Massachusetts Supreme Judicial Court, and I did not advance the argument adopted by that Court. When the defendant filed a petition for a writ of certiorari with the U.S. Supreme Court, the Attorney General's Office took over from the Middlesex District Attorney's Office representation for the Commonwealth, and I was assigned to co-author the brief in opposition. In arguing that the Supreme Court should deny the petition, the brief in opposition contended that "[t]he Second Amendment is not limited to the precise models of weaponry in existence at the time of the founding, but neither does it protect novel weapons or weapons with features that bear scant resemblance to weapons that were common at the time of ratification." Brief in Opposition at 8. And it contended that stun guns "are a wholly distinct sort of weapon, one that has no 18th-century analogues." *Id.* at 9. Without referencing that argument, the U.S. Supreme Court summarily reversed the Massachusetts Supreme Judicial Court's decision, explaining that the lower court's reasoning was inconsistent with *Heller*. *Caetano*, 577 U.S. at 411-12.

If confirmed, and should any case concerning the Second Amendment come before me, I would adhere fully and faithfully to the binding precedent of the Supreme Court and the First Circuit. In particular, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court clarified the methodology applicable to the review of any Second Amendment claim. First, a court must assess whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If so, "the Constitution presumptively protects that conduct." *Id.* The government then bears the burden of "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearms regulation." *Id.* To make that showing, the government must identify an historical analogue that is "relevantly similar" to the challenged regulation. *Id.* at 2132.

b. **Is the Second Amendment a "second class right"?**

Response: No.

44. **During the pandemic, Governor Charlie Baker deemed gun stores "nonessential." You defended Governor Baker's order by stating, "Closure of some of these institutions, like bookstores and schools, may implicate constitutional rights, but the health and welfare of the Massachusetts citizenry depend on these temporary closures."**

a. **Do American citizens lose protection of their constitutional rights during a pandemic?**

Response: No.

b. **What constitutional rights may the government violate or implicate during a pandemic?**

Response: In accordance with the Code of Conduct for United States Judges, it would not be appropriate for me, as a judicial nominee, to comment in the abstract on this question. Should any case come before me concerning the lawfulness of pandemic-related policies, I would impartially and faithfully apply all relevant Supreme Court and First Circuit precedent, including the Supreme Court's decisions in *Tandon v.*

*Newsom*, 141 S. Ct. 1294 (2021) (per curiam), and *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), and the First Circuit's decision in *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153 (1st Cir. 2021). In any case concerning Second Amendment rights, I would likewise impartially and faithfully apply all relevant Supreme Court and First Circuit precedent, including *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Caetano v. Massachusetts*, 577 U.S. 411 (2016), and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

c. **Does the health and welfare of citizenry override the First Amendment during a pandemic?**

Response: Please see my response to Question 44(b).

d. **Does the health and welfare of citizenry override the Second Amendment during a pandemic?**

Response: Please see my response to Question 44(b).

45. **According to your SJQ, you served for a year on the Government Bureau's Racial Equity Working Group.**

a. **What is racial equity?**

Response: I am not aware of a consensus definition for this term. Black's Law Dictionary defines "equity" as "fairness; impartiality; even-handed dealing." Black's Law Dictionary 619 (9th ed. 2004). Racial equity would include fair, impartial, and even-handed treatment of people of all races.

b. **What role do courts have in racial equity?**

Response: Questions concerning the fair, impartial, and even-handed treatment of people of all races are important matters for policy makers and legislatures. The role of a court, however, is to fairly and impartially adjudicate individual cases, with individual litigants and individual claims and defenses, in accordance with the law and with binding precedent. If confirmed, I commit to discharging that duty to the best of my abilities, and to treating everyone of all races equally and fairly.

c. **How do we measure racial equity?**

Response: How racial equity should be measured is an important question for policy makers. If confirmed as a judge, my charge would be to impartially handle the individual cases that come before me in accordance with the law. In my courtroom, everyone of all races would be treated equally and fairly.

d. **How would we determine the end of measures for racial equity?**

Response: This is an important question for policy makers. If confirmed as a judge, my charge would be to impartially handle the individual cases that come before me in accordance with the law. In my courtroom, everyone of all races would be treated equally and fairly.

**Senator Ben Sasse**
**Questions for the Record for Julia E. Kobick**
**U.S. Senate Committee on the Judiciary**
**Hearing: "Nominations"**
**November 30, 2022**

1. **Since becoming a legal adult, have you participated in any events at which you or other participants called into question the legitimacy of the United States Constitution?**

   Response: No.

2. **How would you describe your judicial philosophy?**

   Response: The role of an Article III judge is to fairly and impartially resolve the case or controversy before her. I would approach each case cognizant of the limits on judicial power, with an open mind, and with humility. In every case, I would consult the relevant precedent from the Supreme Court and First Circuit. I would carefully review the factual record, the parties' written submissions, and the parties' arguments. I would engage with the parties respectfully and work diligently to determine how the law applies to the facts of the case. In writing decisions, I would strive to explain my reasoning clearly, so that the parties and the public understand why the law requires a particular outcome.

3. **Would you describe yourself as an originalist?**

   Response: I would not characterize my approach to constitutional interpretation with any particular label. Should a matter of constitutional interpretation come before me, I would research and apply relevant Supreme Court and First Circuit precedent. For some constitutional provisions—for example, the Establishment Clause of the First Amendment, the Second Amendment, and the Confrontation Clause of the Sixth Amendment—the Supreme Court has instructed courts to examine the original public meaning of the provision. *See, e.g.*, *Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2407, 2428 (2022) (Establishment Clause); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022) (Second Amendment); *Crawford v. Washington*, 541 U.S. 36, 43 (2004) (Confrontation Clause). I would adhere to the test and methodology prescribed by the Supreme Court and First Circuit for each constitutional provision.

4. **Would you describe yourself as a textualist?**

   Response: I would not characterize my approach to constitutional and statutory interpretation with any particular label. In any case of constitutional or statutory construction, I would begin by researching whether the Supreme Court or First Circuit has construed the provision at issue and, if so, I would adhere to that construction. Absent binding precedent, I would begin by examining the text of the provision. If the meaning of the provision is clear, I would apply it as written. *See, e.g.*, *Hardt v. Reliance Standard*

*Life Ins. Co.*, 560 U.S. 242, 251 (2010) (in any statutory interpretation case, "we begin by analyzing the statutory language" and "must enforce plain and unambiguous statutory language according to its terms").

5. **Do you believe the Constitution is a "living" document whose precise meaning can change over time? Why or why not?**

   Response: The Constitution is a written document whose text does not change unless it is amended in accordance with the procedures set forth in Article V. The Supreme Court has long affirmed that the Constitution was "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819) (emphasis removed). The Court has accordingly adopted different tests to apply the Constitution's provisions to modern-day facts and circumstances. If confirmed, in assessing any constitutional claim that might come before me, I would adhere to Supreme Court and First Circuit precedent on the constitutional provision at issue.

6. **Please name the Supreme Court Justice or Justices appointed since January 20, 1953 whose jurisprudence you admire the most and explain why.**

   Response: I admire many of the Justices on the Supreme Court and have learned much from observing the care and seriousness of purpose that they bring to each case. Although I do not expect that my approach would mirror the jurisprudence of any one Supreme Court Justice, I had the great fortune to serve as a law clerk to Justice Ruth Bader Ginsburg from 2012 to 2013. During that year, I admired how the Justices on the Court engaged with their colleagues respectfully and worked every day to uphold the rule of law. I would strive to bring those attributes to my work as a judge.

7. **In the absence of controlling Supreme Court precedent, what substantive factors determine whether it is appropriate for appellate court to reaffirm its own precedent that conflicts with the original public meaning of the Constitution?**

   Response: Under the "law of the circuit rule," once a court of appeals has decided a legal issue in a panel decision, that "ruling usually binds later panels too—even where the succeeding panel disagrees with the prior one." *United States v. Guerrero*, 19 F.4th 547, 552 (1st Cir. 2021). An exception to that rule exists when the prior panel decision has been overruled by the Supreme Court, by an en banc decision of the court, or by a legislative enactment. *Id.* The court of appeals may also overrule its precedent "when Supreme Court precedent 'that postdates the original decision, although not directly controlling,' provides a clear and convincing basis to believe that the earlier panel would have decided the issue differently." *Id.* at 552-53 (quoting *San Juan Cable LLC v. P.R. Tel. Co.*, 612 F.3d 25, 33 (1st Cir. 2010)).

8. **In the absence of controlling Supreme Court precedent, what substantive factors determine whether it is appropriate for an appellate court to reaffirm its own precedent that conflicts with the original public meaning of the text of a statute?**

**Senator Josh Hawley**
**Questions for the Record**

**Julia Kobick**
**Nominee, District of Massachusetts**

1. **Then-Judge Ketanji Brown Jackson made a practice of refusing to apply several enhancements in the Sentencing Guidelines when sentencing child pornography offenders. Please explain whether you agree with each of the following Guidelines enhancements and whether, if you are confirmed, you intend to use them to increase the sentences imposed on child pornography offenders.**

    a. **The enhancement for material that involves a prepubescent minor or a minor who had not attained the age of 12 years**

    b. **The enhancement for material that portrays sadistic or masochistic conduct or other depictions of violence**

    c. **The enhancement for offenses involving the use of a computer**

    d. **The enhancements for the number of images involved**

    Response to all subparts: The Supreme Court has held that the Sentencing Guidelines are advisory rather than mandatory, *United States v. Booker*, 543 U.S. 220, 245 (2005), but must be calculated and considered before imposing a sentence, *Molina-Martinez v. United States*, 578 U.S. 189, 193 (2016). Because each defendant's case must be considered individually, it would be inappropriate to comment on whether particular sentencing enhancements should or should not apply in the abstract. If confirmed, I would apply the factors set forth in 18 U.S.C. § 3553(a) and carefully consider the Sentencing Guidelines before sentencing any defendant.

2. **Federal law currently has a higher penalty for distribution or receipt of child pornography than for possession. It's 5-20 years for receipt or distribution. It's 0-10 years for possession. The Commission has recommended that Congress align those penalties, and I have a bill to do so.**

    a. **Do you agree that the penalties should be aligned?**

       Response: The question whether penalties for distribution, receipt, and possession of child pornography should be aligned is a question for policy makers. Consistent with the Code of Conduct for United States Judges, it would not be appropriate for me, as a judicial nominee, to share personal views, if any, on that question. If confirmed, I would apply the relevant statutes and the factors set forth in 18 U.S.C. § 3553(a) in sentencing any defendant convicted of child pornography offenses.

**26. Under what circumstances should a federal court abstain from resolving a pending legal question in deference to adjudication by a state court?**

Response: Please see my response to Question 5.

**27. What in your view are the relative advantages and disadvantages of awarding damages versus injunctive relief?**

Response: The question whether damages or injunctive relief is appropriate in any particular case depends on the facts of the case and the relief requested in the complaint. In general, damages are intended to compensate a party for past harm, while injunctive relief is intended to prevent ongoing or future harm.

**28. What is your understanding of the Supreme Court's precedents on substantive due process?**

Response: The Supreme Court has construed the substantive component of the Due Process Clauses of the Fifth and Fourteenth Amendments to "provid[e] heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Those fundamental rights must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 720-21 (internal quotation marks and citations omitted). Among those fundamental rights protected by the due process clause are the "rights to marry, to have children, to direct the education of one's children, to marital privacy, to use contraception, [and] to bodily integrity." *Id.* at 720 (citations omitted).

**29. The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."**

**a. What is your view of the scope of the First Amendment's right to free exercise of religion?**

Response: The Free Exercise Clause of the First Amendment protects against discrimination on the basis of religion. In general, unless government action that burdens religion is "neutral and of general applicability," the government must establish that the law or policy advances a compelling government interest and is narrowly tailored to that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 546 (1993). Only if the law or policy survives that "most rigorous of scrutiny" is the action constitutional. *Id.*

**b. Is the right to free exercise of religion synonymous and coextensive with freedom of worship? If not, what else does it include?**

Response: I do not understand the Supreme Court to have drawn a distinction between the freedom of religion and the freedom of worship for purposes of the Free Exercise Clause. The Supreme Court has described the right protected by the Free Exercise Clause as both the "free exercise of religion" and the "freedom of worship." *See, e.g., Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) ("The Free Exercise Clause of the First Amendment protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" (quoting *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 450 (1988))); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942) (explaining that the "freedom of worship" is a fundamental right made applicable to the States by the Fourteenth Amendment (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940))). Government regulations that burden religious exercise and are not "neutral and generally applicable" trigger strict scrutiny under the Free Exercise Clause. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam).

c. **What standard or test would you apply when determining whether a governmental action is a substantial burden on the free exercise of religion?**

Response: Please see my response to Question 29(a).

d. **Under what circumstances and using what standard is it appropriate for a federal court to question the sincerity of a religiously held belief?**

Response: Please see my response to Question 15.

e. **Describe your understanding of the relationship between the Religious Freedom Restoration Act and other federal laws, such as those governing areas like employment and education?**

Response: By its terms, the Religious Freedom Restoration Act ("RFRA") provides that it "applies to all Federal law, and the implementation of that law," and that "[f]ederal statutory law adopted after November 16, 1993 is subject to [RFRA] unless such law explicitly excludes such application by reference" to RFRA. 42 U.S.C. §§ 2000bb-3(a), (b).

f. **Have you ever issued a judicial opinion, order, or other decision adjudicating a claim under the Religious Freedom Restoration Act, the Religious Land use and Institutionalized Person Act, the Establishment Clause, the Free Exercise Clause, or any analogous state law? If yes, please provide citations to or copies of those decisions.**

Response: No.

**30. Justice Scalia said, "The judge who always likes the result he reaches is a bad judge."**

**a. What do you understand this statement to mean?**

Response: I understand this statement to refer to the principle that a judge must set aside any personal views and apply the law fairly and impartially in every case. When a judge follows that approach, she may not personally agree with the outcome of every decision she makes, but she is honoring her oath to "faithfully and impartially discharge and perform all the duties incumbent upon me . . . under the Constitution and laws of the United States." 28 U.S.C. § 453.

**31. Have you ever taken the position in litigation or a publication that a federal or state statute was unconstitutional?**

**a. If yes, please provide appropriate citations.**

Response: To the best of my recollection, I have only once taken the position that a federal or state statute was unconstitutional. In *Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171 (D. Mass. 2014), the plaintiffs asserted an as-applied Second Amendment challenge to Mass. Gen. Laws c. 140, §§ 131(d)(i)(E) and 131A. I represented the Commonwealth of Massachusetts, which intervened as a defendant. After carefully considering the plaintiffs' claims, co-counsel and I concluded, on behalf of the Commonwealth, that, as applied, the statutes were not defensible or constitutional. We therefore filed a brief informing the Court that the Commonwealth would not oppose entry of judgment against it on the plaintiffs' as-applied Second Amendment challenge to the statutes.

**32. Since you were first contacted about being under consideration for this nomination, have you deleted or attempted to delete any content from your social media? If so, please produce copies of the originals.**

Response: I have not deleted any postings that I made to my long-private Facebook account or any other social media account. But, in advance of my nomination, I reviewed my Facebook account and noticed that old private messages sent to me by others appeared on my Facebook page. I deleted those messages to protect the privacy of the individuals who had sent the messages.

**33. Do you believe America is a systemically racist country?**

Response: I feel grateful every day to be an American citizen, and I believe deeply in America's founding ideals of equality, liberty, and justice under the law. If confirmed as a judge, my charge would be to impartially handle the individual cases that come before me, including those involving claims of racial discrimination, in accordance with the law. In my courtroom, everyone of all races would be treated equally and fairly.

**34. Have you ever taken a position in litigation that conflicted with your personal views?**

Response: Yes.

**35. How did you handle the situation?**

Response: I always understood that, under canons of professional ethics, I owed a duty to my client to provide zealous representation within the bounds of the law. I strived to offer my best counsel to my clients and was honored to represent my clients in court.

**36. If confirmed, do you commit to applying the law written, regardless of your personal beliefs concerning the policies embodied in legislation?**

Response: Yes.

**37. Which of the Federalist Papers has most shaped your views of the law?**

Response: I have, over the years, consulted the Federalist Papers in handling cases on behalf of the Commonwealth and for personal interest. Although I am not sure that any one particular Federalist Paper has shaped my view of the law more than any other, Federalist No. 78, which describes the nature of judicial power and provides a rationale for judicial review, would be highly relevant to my work as a judge, if confirmed.

**38. Do you believe that an unborn child is a human being?**

Response: Consistent with the Code of Conduct for United States Judges, it would not be appropriate for me, as a judicial nominee, to share personal views, if any, on that question. If confirmed, I would apply the law fairly and impartially and apply any binding Supreme Court and First Circuit precedent on this question.

**39. Other than at your hearing before the Senate Judiciary Committee, have you ever testified under oath? Under what circumstances? If this testimony is available online or as a record, please include the reference below or as an attachment.**

Response: To the best of my recollection, no.

**40. In the course of considering your candidacy for this position, has anyone at the White House or Department of Justice asked for you to provide your views on:**

**a. *Roe v. Wade,* 410 U.S. 113 (1973)?**

Response: No.

**b. The Supreme Court's substantive due process precedents?**

Response: No.

**c. Systemic racism?**

Response: No.

**d. Critical race theory?**

Response: No.

**41. Do you currently hold any shares in the following companies:**

**a. Apple?**

Response: No.

**b. Amazon?**

Response: No.

**c. Google?**

Response: No.

**d. Facebook?**

Response: No.

**e. Twitter?**

Response: No.

**42. Have you ever authored or edited a brief that was filed in court without your name on the brief?**

**a. If so, please identify those cases with appropriate citation.**

Response: One of my primary responsibilities in my current role as Deputy State Solicitor, and in my prior role as supervisor to other Assistant Attorneys General, is to review briefs filed on behalf of the Commonwealth and its agencies and officials in state and federal court. I have, accordingly, edited or contributed to

many briefs filed without my name appearing in the counsel block. I do not have a list of all such briefs, and do not have access to all of the information I would need to compile such a list, but I estimate that there are several hundred briefs that would fall into this category.

**43. Have you ever confessed error to a court?**

Response: To the best of my recollection, I have not confessed error to a court.

**a. If so, please describe the circumstances.**

**44. Please describe your understanding of the duty of candor, if any, that nominees have to state their views on their judicial philosophy and be forthcoming when testifying before the Senate Judiciary Committee. *See* U.S. Const. art. II, § 2, cl. 2.**

Response: Before testifying before the Senate Judiciary Committee, I swore an oath to testify truthfully and to the best of my ability, consistent with my professional and ethical obligations under Code of Conduct for United States Judges, which applies to judicial nominees. I have honored that oath in providing my testimony to the Committee.

**<u>Questions from Senator Thom Tillis</u>**
**<u>for Julia E. Kobick</u>**
**<u>Nominee to be United States District Judge for the District of Massachusetts</u>**

1. **Do you believe that a judge's personal views are irrelevant when it comes to interpreting and applying the law?**

   Response: Yes.

2. **What is judicial activism? Do you consider judicial activism appropriate?**

   Response: Black's Law Dictionary defines "judicial activism" as a "philosophy of judicial decision-making whereby judges allow their personal views about public policy, among other factors, to guide their decisions." Black's Law Dictionary 922 (9th ed. 2004). Judicial activism is not appropriate.

3. **Do you believe impartiality is an aspiration or an expectation for a judge?**

   Response: Impartiality is an expectation of and a requirement for every judge. The judicial oath requires judges to swear to "faithfully and impartially discharge and perform all the duties incumbent upon me . . . under the Constitution and laws of the United States." 28 U.S.C. § 453. If confirmed, I would abide by that oath.

4. **Should a judge second-guess policy decisions by Congress or state legislative bodies to reach a desired outcome?**

   Response: No.

5. **Does faithfully interpreting the law sometimes result in an undesirable outcome? How, as a judge, do you reconcile that?**

   Response: I anticipate that the faithful application of the law will, at times, result in outcomes perceived by some as undesirable. Nevertheless, a judge must, in every case, set aside personal views and fairly and impartially apply the law. If confirmed, I would swear to "faithfully and impartially discharge" my duties, and I would do so to the best of my abilities. 28 U.S.C. § 453.

6. **Should a judge interject his or her own politics or policy preferences when interpreting and applying the law?**

   Response: No.

7. **What will you do if you are confirmed to ensure that Americans feel confident that their Second Amendment rights are protected?**

Response: If confirmed, I would fully and faithfully apply all Supreme Court and First Circuit precedent concerning the Second Amendment, including the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Caetano v. Massachusetts*, 577 U.S. 411 (2016), and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

8. **How would you evaluate a lawsuit challenging a Sheriff's policy of not processing handgun purchase permits? Should local officials be able to use a crisis, such as COVID-19 to limit someone's constitutional rights? In other words, does a pandemic limit someone's constitutional rights?**

   Response: Americans retain constitutional rights during times of emergency, including pandemics. Should any case come before me concerning the lawfulness of pandemic-related policies, I would impartially and faithfully apply all relevant Supreme Court and First Circuit precedent, including the Supreme Court's decisions in *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) (per curiam), and *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), and the First Circuit's decision in *Bayley's Campground, Inc. v. Mills*, 985 F.3d 153 (1st Cir. 2021). In any case concerning Second Amendment rights, I would likewise impartially and faithfully apply all relevant Supreme Court and First Circuit precedent, including *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Caetano v. Massachusetts*, 577 U.S. 411 (2016), and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

9. **What process do you follow when considering qualified immunity cases, and under the law, when must the court grant qualified immunity to law enforcement personnel and departments?**

   Response: Law enforcement officers and other government officials are entitled to qualified immunity from individual-capacity claims for damages so long as "'their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Whether qualified immunity can be invoked depends on the 'objective legal reasonableness' of the official's act." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Harlow*, 457 U.S. at 819). Each assertion of qualified immunity must be analyzed individually and "depends very much on the facts of each case." *Brousseau v. Haugen*, 543 U.S. 194, 201 (2004). If confirmed, I would examine the facts of each case in which qualified immunity was raised, and I would assess whether the law enforcement officer or government official (1) "violated a statutory or constitutional right," and (2) whether "the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). If the answer to either question is no, the officer or official is entitled to qualified immunity.

10. **Do you believe that qualified immunity jurisprudence provides sufficient protection for law enforcement officers who must make split-second decisions when protecting public safety?**

**19. In just three years, the Court of Appeals for the Federal Circuit has granted no fewer than 19 mandamus petitions ordering a particular sitting district court judge to transfer cases to a different judicial district. The need for the Federal Circuit to intervene using this extraordinary remedy so many times in such a short period of time gives me grave concerns.**

**a. What should be done if a judge continues to flaunt binding case law despite numerous mandamus orders?**

Response: I am not familiar with the circumstances described in this question. As a judicial nominee, I do not believe it appropriate for me to comment on matters concerning another federal judge or on cases handled by another federal judge or court of appeals. Nevertheless, as a general matter, every judge has a duty to adhere to the binding precedent of a higher court.

**b. Do you believe that some corrective measure beyond intervention by an appellate court is appropriate in such a circumstance?**

Response: Please see my response to Question 19(a).

**20. When a particular type of litigation is overwhelmingly concentrated in just one or two of the nation's 94 judicial districts, does this undermine the perception of fairness and of the judiciary's evenhanded administration of justice?**

Response: Respectfully, this question is one for policy makers and for the Judicial Conference of the United States. As a judicial nominee, I do not think it appropriate for me to comment. If confirmed, I would fully and faithfully apply the venue rules and binding precedent in any case that comes before me.

**a. If litigation does become concentrated in one district in this way, is it appropriate to inquire whether procedures or rules adopted in that district have biased the administration of justice and encouraged forum shopping?**

Response: Please see my answer to Question 20.

**b. To prevent the possibility of judge-shopping by allowing patent litigants to select a single-judge division in which their case will be heard, would you support a local rule that requires all patent cases to be assigned randomly to judges across the district, regardless of which division the judge sits in?**

Response: Please see my answer to Question 20.

**21. Mandamus is an extraordinary remedy that the court of appeals invokes against a district court only when the petitioner has a clear and indisputable right to relief and**

**the district judge has clearly abused his or her discretion. Nearly every issuance of mandamus may be viewed as a rebuke to the district judge, and repeated issuances of mandamus relief against the same judge on the same issue suggest that the judge is ignoring the law and flouting the court's orders.**

a. **If a single judge is repeatedly reversed on mandamus by a court of appeals on the same issue within a few years' time, how many such reversals do you believe must occur before an inference arises that the judge is behaving in a lawless manner?**

   Response: I am not familiar with the circumstances described in this question. As a judicial nominee, I do not believe it appropriate for me to comment on matters concerning another federal judge or on cases handled by another federal judge or court of appeals.

b. **Would five mandamus reversals be sufficient? Ten? Twenty?**

   Response: Please see my response to Question 21(a).